[Civ. No. 8476. Second Appellate District, Division Two.—July 26, 1934.]

ARTHUR J. YAGUDA, Respondent, v. MOTION PICTURE PUBLICATIONS, INC. (a Corporation), Appellant.

Janeway, Beach & Hankey and S. T. Hankey for Appellant.

Murphy & Doherty and Clyde F. Murphy for Respondent.

ARCHBALD, J., *pro tem.*—For approximately one year prior to April 7, 1929, plaintiff had been selling subscriptions to two publications issued by defendant, paying particular attention to subscriptions obtained on club rates offered newspapers. No salary was paid him, although a purely fictitious salary was fixed in order, apparently, to conform to certain requirements of the audit bureau of circulations which called for payment by a subscriber of a minimum percentage of the published price of the publication. In other words, plaintiff sent his check to defendant for such aggregate minimum, $1.25, on each subscription reported, and the exact amount so remitted was returned to him, $1 of same being charged to expenses and 25 cents to salary. Plaintiff retained the entire amount of subscriptions collected, which in the club rates given newspapers was a minimum of 25 cents for each annual subscription, and this

was his only recompense. The business produced by plaintiff was so gratifying that on April 7, 1929, a letter was written him by defendant's vice-president and general manager, Duncan A. Dobie, reading as follows: ''Confirming the points discussed in our conference this morning, we hereby extend to you National Exclusive rights to sell subscriptions for our publications Motion Picture Magazine and Motion Picture Classic, through newspapers, for a period of two years from date. It is understood that our arrangements with other production sources of this character are to continue until the expiration of present agreements. Terms to be the same as those now in force, and of course, all production is to be in accordance with the requirements of the Audit Bureau of Circulations.''

Plaintiff extended his operations under such letter and continued to sell such subscriptions until March 26, 1930, at which time by agreement he relinquished his rights on the territory east of the Rocky mountains, but kept the Pacific coast territory and operated there until July 17, 1930, when defendant, by letter, terminated the relationship theretofore existing, but gave plaintiff until October 1, 1930, to ''work out problems with whatever newspapers you have tie-ups, and after that date we definitely part company in a business sense''. Apparently the only newspaper with which plaintiff then had a ''tie-up'' was the ''Evening Express'' of Los Angeles. On July 5, 1929, plaintiff had written said newspaper giving it the exclusive use of the magazines named for clubbing purposes at 30 cents per year in certain counties of Southern California, in consideration of the agreement of said paper to use the two publications in the solicitation of new subscriptions, ''as well as your agreement to put on drives from time to time using these magazines for clubbing offers to tie up your present subscriptions''. Because of such cancellation plaintiff was unable to carry out his agreement with the ''Evening Express'', and later filed his complaint for damages alleged to have resulted from the breach of his agreement with defendant.

The trial court found that plaintiff and defendant, ''for a good and valuable consideration, . . . made and executed a contract in writing'' in which defendant granted to plaintiff exclusive national rights to sell subscriptions to said

publications; that the latter had diligently and faithfully performed his part of said contract, but that the same was repudiated by defendant, to plaintiff's damage in the sum of $6,571.24. From the judgment entered on said findings defendant has appealed.

No question is raised on appeal as to the sufficiency of the letters introduced as a writing to take the two-year contract out of the statute of frauds, so we must presume that if any valid objection on such ground existed it was waived in the court below by the introduction of parol evidence as to some of the terms of such contract, without objection.

Regardless of whether plaintiff was an agent of defendant in selling said subscriptions, as respondent claims, or merely an independent contractor, as appellant urges, in our opinion the latter was bound to comply with its agreement unless, as it contends, it had no binding force because no definite volume of subscriptions was agreed to be obtained nor any undertaking made to supply all the magazines respondent might require. That he [respondent] agreed to "produce whatever business we wanted" is clearly shown by a letter from Mr. Dobie, of appellant corporation, to respondent's attorneys; and there is evidence showing that appellant was entirely satisfied so far as volume of business is concerned, although it did, toward the last, express a desire that less of the volume should come from the high postal rate zone and that more of it should come from zones of lower rates. Under the circumstances we believe that the contract was not lacking in mutuality.

Nor in our opinion was it material that the contract made by respondent with the "Evening Express" may have been lacking in mutuality. The evidence shows that the contract was completed by respondent by substituting magazines at a considerable loss to himself. The difficulty of proving damages does not justify breaking a contract, although it may make it comparatively safe to do so, financially speaking. But it is apparent that the damage allowed by the trial court was not based on respondent's inability to perform the "Evening Express" contract, caused by appellant's failure to furnish magazines, nor was the 30-cent rate mentioned in the contract used in computing such damage. Under his fictitious salary arrangement

heretofore mentioned, which was set out in a letter dated June 15, 1928, sent respondent by appellant's general manager, respondent sent to appellant $1.25 for each annual subscription sold. One dollar of this was returned by appellant "for traveling, printing and postage" and the remaining 25 cents as "salary". The evidence shows without conflict that Whitlock & Company, Chicago agents of appellant, sold through their representative on the Pacific coast 27,401 subscriptions to said magazines from October 1, 1930, the day respondent's contract was terminated, to April 7, 1931, the day when the two-year exclusive term expired. Using such figures with the minimum rate of 25 cents, and deducting therefrom respondent's expenses in selling—which he testified amounted to $200 per month, one-fourth of which he allotted to the selling of appellant's magazines—gives a sum which closely approximates the judgment rendered.

That respondent was the agent of appellant for making such sales, even though appellant was interested only in the results obtained and not in the particular way the sales were effected, seems clear from the evidence. Under the circumstances here the law applicable is, in our opinion, well stated in Restatement of Law; Contracts, volume 1, page 517, subdivision E, as follows: "In contracts of agency for the sale of goods on commission, the profits that the agent would have made if he had not been discharged can often be proved with reasonable certainty. Proof of the sales made in the agreed territory before the breach, *or of the sales made there by the principal after the breach,* may be such as to make a reasonably accurate estimate of the commissions that the agent has been prevented from earning. This is less likely to be true if the agency is not an exclusive agency." (Italics ours.) The evidence supports the conclusion that during said period respondent had the exclusive right to sell such publications, through newspapers, on the Pacific coast; that such sales were made there during such exclusive period by a representative of Whitlock & Company, Chicago agents of appellant, which concern sent such subscriptions in to appellant, who accepted and filled them knowing the facts. Appellant's general manager says the letter of April 7, 1929, "was a memorandum to assure him [respondent] that we would not let Whitlock or Fennell operate in that territory"; and the evidence shows that

although Whitlock & Company had its representative on the Pacific coast before respondent's contract was canceled, they were not selling subscriptions to appellant's periodicals in any great number until thereafter, and that Whitlock & Company before that date "could not make any headway due to the fact that they [the newspapers] all wanted Motion Picture Magazine . . . inasmuch as the competitive papers were using it, and they could not supply it". We are of the opinion that under the circumstances the measure of damages used by the trial court was correct.

█ Nor would the fact that respondent, for appellant, executed a contract with Whitlock & Company giving them the right to sell said periodicals in the east for a period of one year from September 1, 1929, on which he was to receive ten cents on each subscription sold, limit respondent's recovery to that amount on each subscription sold by such firm in his exclusive territory after October 1, 1930. The right to sell such subscriptions was limited to the east, and the contract had expired. If appellant gave such firm the right to sell in the exclusive territory after October 1, 1930, it could not limit the damage by any terms contained in any such contract.

Judgment affirmed.

Stephens, P. J., and Craig, J., concurred.