[Civ. No. 16372. First Dist., Div. One. Jan. 29, 1957.]

J. A. ZINN et al., Respondents, v. EX-CELL-O CORPORA-
TION (a Corporation) et al., Appellants.

Walter K. Olds, Pillsbury, Madison & Sutro, Eugene M. Prince, Francis N. Marshall and Lloyd A. Carlson for Appellants.

Livingston & Livingston, David Livingston and Lawrence Livingston for Respondents.

BRAY, J.—Defendants appeal from several judgments awarding plaintiffs damages in the sum of $628,284.85 principal plus $643,049.51 interest from April 13, 1939, to date of judgment—total, $1,271,334.36.[1]

## QUESTIONS PRESENTED

1. Defendants were charged with fraudulently inducing plaintiffs to sell capital stock held by them in a distributing corporation which plaintiffs had organized. Defendants concede that there was a conflict of evidence as to whether defendants were guilty of misrepresentation in connection with

---

[1]This is the third trial and the second appeal. The first trial resulted in judgment for defendants. That judgment on appeal was affirmed as to one Malkson who was president and member of the board of directors of Sealed-Pure, a corporation, and reversed as to all other defendants. (*Zinn* v. *Ex-Cell-O Corp.* (1944), 24 Cal.2d 290 [149 P.2d 177].) At the end of the second trial the late Hon. James G. Conlan, who presided, made a minute order awarding plaintiffs $87,543.28 damages and disallowing interest. Due to his death before findings were signed, no judgment could be entered, and hence the case had to be retried. Additional evidence was adduced at the third trial.

their purchase of plaintiffs' stock, but contend that *as a matter of law* the evidence establishes that plaintiffs knew the allegedly concealed facts and did not act in reliance upon said representations, and that said representations were not material. Hence, say they, there was no actionable fraud.

2. Did plaintiffs state a cause of action?

3. Was Sealed-Pure's default waived, so that Ex-Cell-O had no right to terminate the agency contract?

4. Was the agency contract terminable at will?

5. Was there any basis for damages?

6. Were plaintiffs entitled to interest?

7. Were defendants denied a fair and impartial trial?

(1) Rulings of the court. (a) Reopening of case for deposition of plaintiffs. (b) Disregard of defendants' evidence.

(2) Remarks of trial judge.

(3) Changes in transcript.

(4) Trial judge employs one of plaintiffs' counsel in another matter.

### General Facts

This is the story of a revolution in the type of container used for retail marketing of milk on the Pacific Coast. In 1934 Zinn and others organized the Gold Star Creameries. He was president. The corporation distributed cheese. In 1935-1936 it constructed a building in Everett, Washington, for milk distribution in paper containers. During this time Zinn corresponded with Ex-Cell-O Corporation inquiring about leasing or purchasing its Pure-Pak milk packaging machine. Ex-Cell-O was a Michigan corporation manufacturing machine tools, which had developed said machine for use in packaging and distributing milk in paper containers. Zinn also conceived the idea of establishing a distributorship for the Pure-Pak machine. Zinn spent considerable time and effort in interesting others with him and in contacting Ex-Cell-O to obtain such an agency. Eventually, on October 31, 1937, a final distributorship agreement was executed. This provided that a Washington corporation with a capital stock of 10,000 no par value shares was to be formed by Zinn, Kemp and Malkson.[2] Six thousand shares were to be issued to be paid for by $5,000 to be advanced by Malkson. The remaining 4,000 shares were not to be issued at this time but were to

[2] The defendant in whose favor the judgment at the first trial was affirmed on appeal. Obviously, he was not a party (although a witness) in the subsequent trials, nor is he here.

be used later to raise additional capital. From the 6,000 shares, 500 were to be transferred to Ex-Cell-O. The agreement granted Zinn, Kemp and Malkson the exclusive rights to distribute Ex-Cell-O's machines in the 11 western states and Hawaii, and provided that upon the formation of the corporation these rights were to be assigned by them to it. The machines could not be sold, only leased, and orders would be binding on Ex-Cell-O only if accepted by it. The agents agreed to place three machines in said territory within 90 days and within six months to have installations in three dairies in specified areas, and within two years in 15 dairies in the territory. The agents were to receive 12½ per cent of all rental payments as commissions. For a period of two years, Ex-Cell-O was to set aside 2½ per cent of the royalties collected to be expended under the joint direction of the parties for advertising and promotional services. The agreement recited that a licensing agreement had been entered into between Fibreboard Products, Inc., and Ex-Cell-O under which Fibreboard was given the exclusive right to manufacture blanks for the Ex-Cell-O machines, paying Ex-Cell-O therefor a 5 per cent royalty on all its net mill sales. This sum when received by Ex-Cell-O was to be paid to the agents. Fibreboard was required to pay an additional royalty of .00675 per cent for a period of two years, which Ex-Cell-O was to set aside for establishing and supporting a distributing agency.

Preparing for the agency contract, the Sealed-Pure corporation was organized October 21, 1937. Malkson put up $5,000 for the issuance of 6,000 shares. Of these, 1,667 went to Zinn, who was president, 1,667 went to Kemp, who was secretary, 1,667 to Malkson, who was treasurer, 499 to Ellis and 500 to Ex-Cell-O as agreed. Later Zinn bought 1,875 shares of the treasury stock at $1.00 per share. Seven hundred ninety-one shares of the treasury stock were issued to Kemp, who transferred 625 of them to L. P. Nelson. Fifty shares were issued to Schroeder and the remaining 1,284 shares were issued to Malkson. Gold Star was issued 1,875 shares of that stock. Of the Gold Star stock, 875 shares were transferred to W. M. Nelson, 40 shares to McLaughlin and 60 shares to Ethel Zinn. Within five months of the incorporation all of the Sealed-Pure stock had been issued. Most of its capital, plus $1,875 which Ex-Cell-O had paid it as advance commission on a machine placed with Gold Star, had been loaned to Gold Star, the parties feeling that in order

for the agency to succeed, the Gold Star paper container operation, the first in the west, must be successful. By early 1938 Sealed-Pure had only about $800 as working capital. This bred dissension between Malkson, Zinn and Kemp, which was increased by the fact that the operation of the machine leased to Gold Star was delayed by a Seattle ordinance prohibiting the sale of milk in cartons. Huffman, an Ex-Cell-O employee, went to Seattle to assist in setting up the Ex-Cell-O machine. By this time Sealed-Pure was near default of the requirement that within 90 days it place three machines. Huffman, at Malkson's request, wired Ex-Cell-O requesting extension of "four months from time of dairy opening for shipment of second machine." Scott replied that Ex-Cell-O appreciated the delay and "Will gladly cooperate in extending installation date . . . provided aggressive sales effort is made." Huffman then reported to Ex-Cell-O in more detail concerning Sealed-Pure's situation. Zinn wired and then wrote Scott, giving his story of the situation and accusing Huffman and Malkson of collusion. Late in February, 1938, Scott met plaintiffs in Seattle and told them that Bixby, the president of Ex-Cell-O, was "terribly dissatisfied" with the conduct of the business and threatened to cancel the agency contract unless the matter was straightened out. Scott made suggestions. He then wrote Bixby his impression of the situation.

March 9, 1938, Zinn, Kemp and Malkson met with Scott and told him their differences had been resolved, and that they were ready to make the changes suggested by him. Accordingly, Malkson was made president of Sealed-Pure, in place of Zinn, and also treasurer and general manager. Zinn was elected vice president, and Scott and Malkson's brother, directors. A headquarters for Sealed-Pure was established in San Francisco. Scott and Malkson then called upon all the major dairies in several California areas. They called upon Sneed, president of Lucerne Cream and Butter Company, a subsidiary of Safeway, who had previously visited the Gold Star plant and was unfavorably impressed with the operation of the Pure-Pak machine, although, having tested consumer acceptance of the milk sold in paper cartons by Gold Star, he found that favorable. Sneed told Malkson and Scott that he was not ready for a trial installation. They both reported this to Zinn.

April 30th, the six months given by the contract to install

machines in dairies in three specified areas, elapsed, without such installations. May 2, 1938, Malkson wrote Zinn that he had seen Sneed and that the latter's final decision as to whether he would take a machine depended on "what the Everett stores do the next few months" and that Scott had agreed to make trial installations at "Los Angeles and here," and if they could get the right dairy, "So, we are still in the ring." May 9, 1938, Malkson wrote Kemp that Petersen, a Sealed-Pure salesman, was making some progress in the Los Angeles area and new contacts in the San Francisco area, and that Ex-Cell-O "has given us authority to place a machine either in Bellbrook, Safeway or Marin Dell on a trial basis." As will later appear, Ex-Cell-O on July 25, 1938, accepted an order from Safeway for one machine on a 90-day trial with fixed amounts to be paid if it kept that machine and desired more.

At the time Bixby was negotiating with Safeway, he told Malkson that he was dissatisfied with the way Sealed-Pure had functioned and that he could see nothing to do but to cancel the contract. Malkson said he did not blame him but that he did not want the contract cancelled. He then asked Bixby for a job if the contract were cancelled. Bixby then said he planned to go to Seattle to look into the Gold Star affairs and perhaps work something out with Zinn and Kemp. At Seattle on July 28, 1938, Bixby met with Zinn, W. M. Nelson, Kemp and Ellis and told them of his dissatisfaction with the way Gold Star was meeting its obligations on the machine leased to it. Bixby told them that Ex-Cell-O was going to cancel the contract. The stock in Sealed-Pure which Gold Star had bought had been paid for with Gold Star notes. Bixby stated that if they would take these notes as part payment he would try to get Ex-Cell-O to buy their shares at $1.00 per share.[3] On returning to Detroit, Bixby, on August 1st, wrote to plaintiffs cancelling the agency contract. On August 17th Bixby wrote Zinn stating terms for the purchase of the stock. August 24th, Zinn wrote Bixby, expressing his understanding of the terms offered, accepting them, and enclosing the stock certificates. They were unendorsed. Bixby on August 26th sent Zinn a check for the amount required, and a receipt to be signed evidencing the entire transaction. He also returned the stock for endorsement. August 31st, Zinn forwarded the endorsed stock and the receipt to

[3]The discussion concerning Safeway will be considered later.

Bixby. Plaintiffs testified that they would not have sold had they known the true Safeway transaction.

1. *Plaintiffs' Knowledge of the Safeway Transaction.*

As before stated, defendants concede that the evidence upon the question of Bixby's misrepresentation or failure to disclose was conflicting and that therefore this court is bound by the trial court's determination of that subject. So, we will consider only plaintiffs' version of the representations, and then, only sufficiently to lay the background for the evidence concerning plaintiffs' knowledge of the Safeway transaction, which evidence defendants contend is conclusively against plaintiffs. Here, again, if there is any conflict on the subject, we are bound by the court's finding that plaintiffs had no such knowledge.

Safeway came into the picture in February, 1938, when Sneed, president of Lucerne Cream and Butter Company, a subsidiary of Safeway, visited the Gold Star plant. While unfavorably impressed with the operation of the Pure-Pak machine leased from Ex-Cell-O by Gold Star, he had tested customer acceptance of milk sold in Gold Star cartons and found it favorable. In March, Scott and Malkson called upon Sneed who stated that he was not ready for a trial installation. They reported this to Zinn. On May 2d, Malkson wrote Zinn that he had seen Sneed and that his final decision on whether he would buy a machine depended upon what the Everett stores did during the next few months. July 15, 1938, Sneed wired Bixby for a copy of Ex-Cell-O's form of Pure-Pak machine contract and inquired if he was willing to install a machine in Safeway's San Francisco plant. He stated that he was taking the liberty of wiring direct as Malkson was out of town. The next day Bixby airmailed forms of the lease agreement and expressed Ex-Cell-O's willingness to make a trial installation. July 18th, Kirkland, a Safeway executive, in Malkson's presence, phoned Bixby, at Detroit, that Safeway was ready to accept Ex-Cell-O's trial offer and would need 15 to 18 machines, but he did not like the terms of the agreement and asked that a representative of Ex-Cell-O come to Oakland, authorized to agree to changes in the agreement. July 22d, Bixby, Malkson, Kirkland and Sneed discussed a revised agreement. It was not satisfactory to Bixby, who then suggested that Safeway might buy the machines outright, $32,500 for the first machine, $37,500 for additional machines. A purchase order, accepted by Bixby on

July 25th, was given by Safeway. This provided that Safeway was to have 90 days free use of one machine. If not satisfactory it would be returned without cost, except that Safeway would pay shipping costs both ways. If Safeway kept the machine over 90 days it was to pay Ex-Cell-O $32,500 therefor. Further machines ordered before December 31, 1939, were to cost $37,500 each. Kirkland and Sneed told Bixby that they wanted Safeway to introduce the first paper milk container in the area without Safeway's competitors knowing of it, and asked that the installation be kept secret.

Malkson, of course, was in on these negotiations with Safeway, but plaintiffs were not. Bixby at this time told Malkson that he was going to have to cancel the agency contract, and Malkson asked Bixby for a job if the contract was cancelled. Bixby then went to Seattle and conferred with Zinn and the other plaintiffs. Bixby denies the representations claimed to have been made by him at these conversations but admits that he did not tell any of the plaintiffs concerning the Safeway purchase of a machine. He claims that he did tell Wm. Campbell, the Ex-Cell-O mechanic who was working on the machine leased by Gold Star, that a machine was to be placed with Safeway on a trial order. Of course, this was not telling plaintiffs. Campbell claims that when on August 13th he left Gold Star he told Zinn that he was going to California to install a machine. He did not state for whom. Zinn denies this. The plaintiffs testified that Bixby told them that he had talked with Malkson and had interviewed all possible prospects, but none of them was ready to buy or try the machines, and stated positively that no deals, orders or sales had been made. It was in reliance on these statements that plaintiffs sold Ex-Cell-O their stock. August 10th, Petersen had written Zinn that the prospects of putting over some deals looked good, and stated that he had been forbidden to write Zinn. On August 17th Bixby wrote in a letter that Safeway was trying to get the Oakland ordinance against paper containers changed, "but as yet they have not placed an order with us for equipment to be installed in Oakland." In that letter Bixby requested that all Gold Star stock be forwarded to him and stated what he had agreed at Seattle to pay for it. He then offered, however, to make an allowance of $2,000 instead of $1,000 for the outstanding Gold Star notes. On August 13th, Jerseymaid in Los Angeles signed a lease agreement for a machine and sent it to Ex-Cell-O for approval.

August 17th, Malkson was hired by Ex-Cell-O as its agent to solicit orders for machines.

Up to this point there is no evidence to contradict the testimony of plaintiffs that they had no knowledge of the true Safeway situation.

August 27th, the Oakland Wholesale Grocery Company wired Gold Star asking confidential information as to the operation of the Ex-Cell-O machine and the competitive success of the milk containers. Zinn then wrote Bixby asking what answer he should make and stating: "Knowing of your deal in Calif. thru the local Safeway I do not wish to answer this until you let me know what your pleasure is." August 30th Zinn wrote Bixby stating, among other things, that Campbell had written Gordon (Gold Star's machine operator) "also that Safeway would open on the 4th in Frisco," that Gordon had not told Zinn about "Campbell's writing about Frisco deal" but had told another who told Zinn. "If that is o. k. with you it is with me—just question effect on Safeway if they hear it, and I don't want to be blamed for letting out any 'advance news.' "

On August 30th, Campbell was in Seattle. Campbell testified he then told Zinn of the Safeway installation in San Francisco. When asked why he did not investigate the use of the machine by Safeway, Zinn testified that he believed in Bixby's integrity and his statement that Safeway had not purchased any machines, that he knew offers had been made to install them (this is what he meant by his statement in the August 27th letter, "Knowing of your deal in Calif. thru the local Safeway"), that it would involve the expenditure of some $30,000 to open up the territory and that possibly Ex-Cell-O might have placed some machines on trial. In an undated letter but contained in an envelope postmarked August 31, 1938, Zinn wrote Petersen that Ex-Cell-O had cancelled the agency contract and bought the Sealed-Pure stock "at a time when Safeway bought a machine for S. F. which opens Sept 4th 1938." This letter was not produced at the prior trials, and for some reason no questions were asked Zinn concerning it.

September 1st, Bixby wrote Zinn in response to Zinn's August 30th letter in which Zinn had stated that he had learned that Campbell had informed "that Safeway would open on the 4th in Frisco." Bixby stated that the Safeway people had pledged him to absolute secrecy "in connection

with their San Francisco installation" and "we have been very careful not to expose this news to anyone" but that, as the news was now out in San Francisco, the fact that the news was out in Seattle would make no difference.

When asked if he knew at the time he received this letter that the Safeway people had a Pure-Pak machine, Zinn testified that he had heard that Safeway had placed an order for blanks, but not that they had an installation. He took it to be a confirmation from Bixby of what he had already been told, that Safeway had bought blanks, "and I would naturally think that they were going to have a machine, but as to whether it was installed or not at that time I did not know." The letter indicated to him, not that they had installed a machine, but that they were going to install one.

September 6th, Safeway advertised the sale in San Francisco of milk in Pure-Pak containers. W. M. Nelson and Zinn saw the ad in the early part of that month. Plaintiffs testified that although they now knew that Safeway had a machine, they assumed it was purchased after they had sold Ex-Cell-O their stock, and that the first time they suspected that Safeway had a machine from Ex-Cell-O prior to August 1, 1938, was when Zinn, on January 1, 1939, visited the Fibreboard plant at Port Angeles, Washington, and was told that Safeway had purchased on August 1, 1938, 100 tons of paper carton blanks.[4] Zinn then had an attorney investigate, and for the first time actually learned of the Safeway order of late July, 1938.

"Actual fraud" and "deceit" are defined in similar terms by the code. (Civ. Code, §§ 1572, 1709, 1710.)

The general elements of a cause of action for fraudulent misrepresentation are (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. (See *Seeger* v. *Odell* (1941), 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; Rest., Torts, § 525 et seq.)

Mere nondisclosure of facts is ordinarily not enough to constitute fraud, but it may be actionable under certain circumstances. One situation is where the defendant, who has no duty to speak, nevertheless does so. In such a case he is bound to speak truthfully and to speak the whole truth.

[4] The evidence that the Fibreboard books did not contain the data Zinn claimed to have seen there merely caused a conflict in the evidence which the court resolved.

(*Dyke* v. *Zaiser* (1947), 80 Cal.App.2d 639, 652 [182 P.2d 344] ; *Sullivan* v. *Helbing* (1924), 66 Cal.App. 478, 483 [226 P. 803] ; Civ. Code, § 1710, subd. 3 ; Rest., Torts, § 529.)

The evidence supports the court's finding that Bixby not only intentionally concealed from plaintiffs the sale to Safeway but actually represented to them that no such sale had taken place for the purpose of. getting them to acquiesce in the termination of their agency and to sell their stock in Sealed-Pure. ■ While it is true that most of the evidence supporting this finding is what defendants call "self-serving," the testimony of an interested party is competent and admissible (*Divani* v. *Donovan*, 214 Cal. 447 [6 P.2d 247]), and if believed by the trial court, is sufficient to determine the issue. Here the trial court believed plaintiffs.

Defendants rely strongly on Zinn's letter of August 31st in which he stated that Ex-Cell-O had purchased the stock at a time when Safeway had bought a machine "which opens Sept 4th." It must be remembered that on August 17th, after Zinn on August 7th had written him "I learned about the possible placing of a machine in Oakland this month of which I knew nothing," Bixby wrote that Safeway had been working to have the Oakland ordinance changed "but as yet they have not placed an order with us for equipment to be installed in Oakland." This letter also gave Bixby's terms for the purchase of the stock. Believing Bixby, Zinn on August 24th mailed the stock to Bixby, although unendorsed. August 26th, Bixby sent payment for the stock. Zinn's explanation as to his statement in his August 27th letter, "Knowing of your deal in Calif.," his statement in his letter of August 30th about the "Frisco deal," and his statement in his letter of August 31st (at this time the sale of stock had been consummated) that Safeway had bought a machine, while consistent with a finding that Zinn knew that a sale to Safeway had been made prior to the cancellation of the agency agreement and to the sale of the stock, is not compellingly so and is not inconsistent with a finding to the contrary.

No evidence was introduced by either side concerning Exhibit XX (the letter of August 31st). It stands alone. Ex-Cell-O, in essence, relies on it principally for reversal of the case on the liability issue. Ex-Cell-O, relying heavily upon *Bassett* v. *Johnson* (1949), 94 Cal.App.2d 807 [211 P.2d 939], argues that this letter is so positively at variance with the oral testimony of plaintiffs as to their knowledge

of the fraud, that there ceases to be a substantial conflict in the evidence on that issue.

The findings do not specifically refer to Exhibit XX. However, by implication the trial judge found that it did not conclusively establish the fact of plaintiffs' knowledge of the fraud before the purchase of the stock. ■ The rule seems to be that where the trial judge interprets a document solely from the writing within its four corners, the interpretation is a matter of law, and the appellate court may give the writing a different interpretation if the trial judge's appears to be unreasonable. (*Estate of Platt* (1942), 21 Cal.2d 343, 352 [131 P.2d 825].)

Certainly the letter is ambiguous. If taken as true that Zinn meant ''bought'' when he wrote ''bought,'' it still is not conclusive that he knew of the Safeway transaction before the plaintiffs' stock was purchased. In the first place, Safeway had not bought a machine; it had only an option to buy. The sale of the stock is said by defendants to have been consummated on August 31, 1938. But this does not mean that the actual sale did not occur earlier. The sale of the stock appears to have actually occurred no later than the date of August 26, 1938, when Bixby sent the payment for the stock, which had been previously sent to him by Zinn. Patently, Bixby and Zinn felt this to be so.[5] Thus, it is by no means unreasonable to interpret the sentence, ''Cancellation and purchase of Sealed Pure Stock came at a time when Safeway bought a machine for S. F. . . .,'' to mean that Zinn was not aware that the Safeway contract was executed before the purchase of the stock.

Ex-Cell-O contends that the testimony of disinterested witnesses, to the effect that Zinn had knowledge of the Safeway deal before the sale of the stock, establishes that ''the great current of the evidence is against the finding.'' ■ Without stating this testimony, it suffices to say that there is testimony by the plaintiffs to the contrary; and by Zinn, denying that the conversations testified to above ever took place. All this testimony is merely a compilation of conflicting evidence. There is substantial evidence here from which the trial judge could find in accordance with Zinn's testimony. ■ The testimony of one witness may be sufficient, as against any number of witnesses testifying to the

---

[5]In Bixby's letter of August 26th he stated, ''Now that we are the sole shareholder in Sealed Pure . . .''

contrary, for the proof of a fact in a civil case. (*Menning* v. *Sourisseau* (1933), 128 Cal.App. 635, 639 [18 P.2d 77].)

The appellate court ordinarily looks only at the evidence supporting the successful party, and disregards the contrary showing. "Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*Estate of Teel* (1944), 25 Cal.2d 520, 527 [154 P.2d 384].)

Ex-Cell-O asserts that Zinn's testimony on the discovery he made at Fibreboard's Port Angeles plant, along with plaintiffs' bare testimony that none of them had knowledge until January 1, 1939, of the Safeway transaction, do not serve to meet the definition of "substantial evidence," when balanced against the positive, direct evidence in Exhibit XX, the "new and disinterested witnesses," and the Port Angeles record. The answer to that is, again, given in the Teel case, *supra*.

Certainly Zinn had scattered scraps of information that something was astir in San Francisco or Oakland. But Zinn knew that Ex-Cell-O had authorized Sealed-Pure to place machines on a trial basis. Knowing this and that Bixby, upon whom he relied, had told him that no deal had been made, we cannot say that he was not justified in believing that no deal had been made and in not making an investigation. Nor in view of this situation can we say that his letter of August 31st shows that he had knowledge of the fraud before plaintiffs sold their stock. Correspondence between Malkson and Zinn who had charge of Sealed-Pure's San Francisco office had ceased during the critical months of July and August, because plaintiffs were unable to send Malkson any finances. At this time, too, Malkson was negotiating with Bixby for a job and was not desirous of giving plaintiffs any information as to the progress with Safeway.

Defendants' contention that Bixby's representation that no order had been given by Safeway is not a material one is well answered by the foregoing recital of facts. While it is true that both Gold Star and Sealed-Pure were in financial difficulties, and that plaintiffs had not performed the agency contract according to its terms (such performance, however, had been waived by Ex-Cell-O), it is obvious that plaintiffs

would have valued their Sealed-Pure stock more highly had they known the true situation.

2. *Plaintiffs' Cause of Action.*

Defendants seem to think that this action is for wrongful termination of the agency contract and contend that such a cause of action would lie only in the Sealed-Pure Corporation and not in the individuals who assigned their contract to it. This action, however, is not for that cause, but is for fraud in inducing plaintiffs to sell their stock. That obviously is a cause of action inhering in each person so wronged. The law of the case as set forth in *Zinn* v. *Ex-Cell-O, supra,* 24 Cal.2d 290, is that in fixing the amount of damages sustained by plaintiffs the claim that the agency was wrongfully terminated may be considered. "Whether by reason of the termination of the agency contract Sealed-Pure was entitled to recovery against Ex-Cell-O for wrongful repudiation of the agency contract is a matter bearing upon any possible additional damages." (24 Cal.2d at p. 298.)

3. *Termination of Contract.*

The court found that there was no failure to comply with the terms of the contract other than the failure to comply with the stipulations as to time of placement of machines, and that such noncompliance was waived by Ex-Cell-O, in addition to which Ex-Cell-O up to the very moment of cancellation was inducing Sealed-Pure to continue with the agreement. The evidence supports this finding.

Admittedly the corporation had little capital for the project it had undertaken, but it was organized and capitalized according to the terms of the agency contract. Its diversion of capital to Gold Star was obviously the wisest expenditure of its money because there was reluctance by all potential lessees of the Pure-Pak machines to employ this revolutionary method of packaging milk until it had been proved. It is true that some success had been shown by the users of the machines in the eastern United States, but the degree of perfection of the machines and customer acceptance of the cartons was still unsettled in the minds of potential western users.

The evidence clearly shows that all parties were agreed that the success of distributing Ex-Cell-O's machines on the west coast depended primarily upon Gold Star making a success of the operation of its machine (the first on the coast) and the use of its paper cartons, and that if the Gold Star operation failed, Ex-Cell-O's opportunity to dispose of its

machines would likewise fall. Scott, in a letter to Bixby, March 7, 1938, so stated and also stated that that also was the opinion of Fibreboard, from whom the carton blanks were to be obtained. About May 2d Sneed had told Malkson that his interest depended almost entirely upon the success of Gold Star's paper containers in the Everett stores during the next few months. On January 20, 1938, Ex-Cell-O in a telegram replying to one of Malkson's asking for extension of four months from time of dairy opening for shipment of second machine, stated that it would cooperate in extension of the installation date, providing aggressive sales effort was made. A reasonable interpretation of these telegrams is that the time for all installations was extended provided aggressive sales efforts were made. While there were expressions by Ex-Cell-O of dissatisfaction with the way matters were going, Ex-Cell-O consistently aided and encouraged Sealed-Pure in its efforts. Scott suggested, and obtained a reorganization of the management. In May, 1938, Ex-Cell-O helped reduce Sealed-Pure's financial difficulties by its purchase of Gold Star notes from Malkson. July 1st, Scott wrote Malkson that the Ex-Cell-O management and he believed that "you are doing a very, very good job there on the Coast." Sneed's telegram to Bixby was made in Malkson's presence, and Bixby's interviews with Sneed were likewise. All of Ex-Cell-O's acts up to about the time of the actual signing of the Safeway order showed a desire on the part of Ex-Cell-O to continue relations with Sealed-Pure and to waive any default in its contract.

4. *Terminability at Will.*

The court found that from the contents of the agreement and the circumstances it was the intention of the parties that the contract was terminable only for good cause, and was to give Sealed-Pure the right to continue as the exclusive distributor of machines in the territory as long as it performed the terms of the contract and the objects and purposes of the agreement could be served.

There is no express provision in the agency contract as to its term. Ex-Cell-O contends that it is well settled in this state that a contract of agency which specifies no term or period of duration is terminable at the will of either party without liability. This may be true in some circumstances. (See *Speegle* v. *Board of Fire Underwriters* (1946), 29 Cal. 2d 34, 39 [172 P.2d 867] and citations therein.) But that is not true where the intentions of the parties may be ascer-

tained "by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.) Also, the contract itself may have indications as to the intentions of the parties, even though not express. ▋ And "where parol proof is admitted for the purpose of assisting the court to ascertain the intention of the parties and where conflicting inferences may be drawn, it is the constitutional function and duty of the trial court to determine the meaning of the parties and such finding is binding on the reviewing court." (*Estate of Guasti* (1953), 117 Cal. App.2d 612, 617 [256 P.2d 629].)

▋ The agency contract here itself indicates that the parties did not contemplate termination at will. Paragraph 8 provides that Ex-Cell-O can terminate upon Sealed-Pure's default and after 15 days' notice. The definite times for the accomplishment of certain machine placements, in paragraph 6, tends to negative an intention that it be terminable at will. The provisions of paragraph 11 indicate that the contract was to continue well beyond the time limit established for the placement of machines, when it provided for the payment of royalties to Sealed-Pure for a two-year period for "advertising or promotional services." Again, in paragraph 12, royalties were to go to Sealed-Pure "during the life of this agreement . . ." The requirements of paragraphs 1 and 3 that a corporation be formed to carry out the contract implies permanency.

Additionally, as evidence of Ex-Cell-O's interpretation of the contract, Scott wrote Malkson July 8, 1938, to the effect that he hoped that Sealed-Pure's association with Ex-Cell-O remained successful and pleasant for a great many years to come. The notice of termination of the agreement did not purport to terminate because of any right to terminate at will, but because of alleged default. The very nature and size of the undertaking which burdened plaintiffs once they executed the agency contract indicates that there was no intention that it should be terminable at will. Otherwise, plaintiffs could be denied the fruits of their labors even on the threshold of success. Equitable principles would prohibit such an oppressive result. The above also supports the finding that the contract continued "beyond September 30, 1949."

5. *Basis for Damages.*

▋ Defendants contend that as a matter of law plaintiffs have proved no damages from the wrongful termination

of the agency agreement, in that Sealed-Pure's business was unestablished, it had realized no profits and its commissions were dependent upon performance. While all of these statements are true, nevertheless plaintiffs were damaged. If defendants' contention were true, then there never could be any damages suffered by the breach of a contract near its inception. It is clear that Sealed-Pure laid the foundation for the placement of the machine with Safeway before the cancellation of the contract. The placement of the machine and the tentative order, if known to plaintiffs, would have had a tremendous impact upon the value of their stock. Lacking knowledge of this, they sold their stock for $1.00 per share. Certainly the *fact* of damage is thus established. ''Section 3343 of the Civil Code provides that one defrauded in the sale of property is entitled to recover the difference between the actual value of that with which he parted and the actual value of that which he received. The value of the stock is to be determined by the worth of the corporate assets, not the 'market value' of the stock. [Citations.] Future profits may be shown for the light that they throw on the value of the stock at the time of its fraudulent purchase. [Citations.] . . . One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness. [Citations.]'' (*Zinn* v. *Ex-Cell-O Corp., supra,* 24 Cal.2d at p. 297.)

Clearly the amount of income Sealed-Pure would have had but for the cancellation of the contract can be calculated with sufficient certainty by application of the terms of the agency contract to the income Ex-Cell-O had from the placement of machines in the period subsequent to the cancellation of the contract. The fact that Sealed-Pure had an exclusive contract within a certain area aids in the certainty of the calculation. (*Yaguda* v. *Motion Picture Publications, Inc.* (1934), 140 Cal.App. 195, 199 [35 P.2d 162].)

Ex-Cell-O argues that the amount of revenue earned by it does not establish that Sealed-Pure could have accomplished the same amount of business. The answer to this is in *Hacker etc. Co.* v. *Chapman Valve Mfg. Co.* (1936), 17 Cal.App.2d 265, 267-268 [61 P.2d 944], where the court, in a somewhat similar situation, said: ''It is held generally that the breach of an exclusive sales agency contract through the invasion of the territory of the agent . . . will entitle the latter to the profits he would have made upon sales in the

amount of those made by his principal in the invaded territory. . . . The fact that the goods were sold by defendants furnished sufficient proof that they could have been sold by plaintiff.'' Every case cited by Ex-Cell-O for the proposition that damages for the breach of agency contracts is too speculative, involve fact situations where the plaintiffs attempt to prove what business could have been done but for the breach of the contract. They are not in point in this case where there is proof of what *was actually done* by the principal, and could have been done by the plaintiffs but for the breach of the contract.

Defendants contend that the Fibreboard royalties cannot be considered as Ex-Cello-O might have terminated the Fibreboard agreement. The answer to this is that had the agency contract not been wrongfully cancelled, Ex-Cell-O could not legally destroy Sealed-Pure's right to part of the Fibreboard royalties by releasing Fibreboard from its duty to pay. In *Universal Sales Corp.* v. *California Press Mfg. Co.* (1942), 20 Cal.2d 751, 771 [128 P.2d 665] the court said: ''In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . .''

The agency agreement set forth that Ex-Cello-O had entered into an agreement with Fibreboard for the exclusive right in the territory to manufacture blanks for its machines and provided that Sealed-Pure would receive certain proportions of the royalties to be received from Fibreboard. As pointed out before, an additional percentage for a period of two years was to be used by Ex-Cell-O for the purpose of establishing and supporting Sealed-Pure as a distributing agency. Moreover, in the agreement between Ex-Cell-O and Fibreboard, Ex-Cell-O agreed to pay such royalty to a distributing agency in order to bring about the installation of as many machines as possible to increase Fibreboard's sale of blanks. The same rule applies to the Kieckhefer Container Co. royalties which the court considered in fixing damages. Because Fibreboard could not meet the demand, Ex-Cell-O on May 1, 1947, also licensed Kieckhefer to manufacture blanks for Pure-Pak machines in the Pacific Coast territory for which Kieckhefer was to pay royalties. The court found that Sealed-Pure's share of those royalties would have been $283,610.10. While, of course, there is no mention of Kieckhefer in the agency contract, the contract provides that the agents were to receive a

percentage of the royalties from the Fibreboard contract. In that contract Fibreboard was to have the exclusive right in the territory to produce the blanks to be used in the Ex-Cell-O machines. The fact that Ex-Cell-O saw fit to divide the blank business with another concern than Fibreboard could not deny Sealed-Pure the royalties it was promised from all sales of blanks within its territory.

The trial court properly found that there must be deducted from the royalties that Sealed-Pure would have received, the expenses Sealed-Pure would have incurred in transacting the business required by the contract. This amount the court found to be $138,900. The court added the expenses of Sealed-Pure during its operation, the cost of a trained supervisor which Sealed-Pure was required to employ, and the amounts paid by Ex-Cell-O over a period of 11 years as salary and expenses of its service men. While Ex-Cell-O claims the true expenses would have been $700,000, the trial court resolved the conflict in favor of plaintiffs. It must be remembered that considerable latitude is allowed a plaintiff in proving damages in a fraud case. " '. . . the wrongdoer shall bear the risk of the uncertainty which his own wrong has created . . .' " (*Speegle* v. *Board of Fire Underwriters, supra,* 29 Cal.2d at p. 46.) The evidence supports the finding.

6. *Interest.*

The trial court allowed interest from the date of filing suit, applying section 3288, Civil Code, which permits, in the discretion of the trier of fact, the allowance of interest in a fraud action. Defendants contend this was improper for the reason that they claim that the wrong occurred in Washington, and that therefore the law of that state, which they claim does not allow interest in a tort action, applies. We agree with their contentions.

The question of whether interest as part of the damages for a tort is to be allowed is to be determined by the law of the place of wrong or the place of the forum, has never been determined in California. The Restatement, Conflict of Laws, section 419, states that the law of the place of the wrong governs. Volume 11, California Jurisprudence 2d 206, states that the Restatement on this subject is not supported by California authority, "although authority to the contrary is meager and has little persuasive. value." Actually, there appears to be no authority on it here. The three cases relied

upon by the California Jurisprudence article dealt not with torts but with breaches of contract. The holding in each instance was that the law of the forum applies as to granting interest for breach of contract, contrary to the statement in Restatement, Conflicts of Law, section 418, that the place of performance of the contract governs. Thus, *Perkins* v. *Benguet Consol. Min. Co.*, 55 Cal.App.2d 720 [132 P.2d 70], involved the question of the failure of a corporation to pay stock dividends to the owner of the stock. In holding that the law of the forum governed, the court treated the case as one of contract. All of the authorities mentioned upon which its decision was based dealt with contracts. *Nesbit* v. *MacDonald*, 203 Cal. 219 [263 P. 1007], and *Bank of United States* v. *Foreman*, 102 Cal.App. 756 [283 P. 874], each dealt with the question of whether interest was allowable on a foreign note which did not provide for interest. Thus the California Jurisprudence statement is erroneous. It is interesting to note that the California courts have followed the Restatement, section 420, which provides that in an action on a foreign judgment the rate of interest allowed for delay in satisfying the judgment is determined by the law of the place where the judgment was rendered. (*Thompson* v. *Monrow*, 2 Cal. 99 [56 Am.Dec. 318]; *Cavender* v. *Guild*, 4 Cal. 250; *Stewart* v. *Spaulding*, 72 Cal. 264 [13 P. 661].) Likewise, on the question of damages generally in a tort action California has followed the Restatement, Conflict of Laws, section 412: "The measure of damages for a tort is determined by the law of the place of wrong." See *Klaffki* v. *Kaufman*, 52 Cal.App. 48 [198 P. 36], action for statutory penalties for nonpayment of wages. The court there distinguishes between the law of contract which applies to the employment contract and the law of tort which applies to the statutory penalty. See also *Ponsonby* v. *Sacramento Suburban Fruit Lands Co.*, 210 Cal. 229 [291 P. 167]. That was an action for damages for fraudulent representations by which the plaintiffs were induced to exchange real property in Minnesota for property of much less value in California. An attachment had been issued on the theory that the action was for "damages, arising from an injury to property in this State . . ." (Code Civ. Proc. § 537, subd. 3.) In holding that the attachment was properly based the court in order to find that an injury to property had occurred in this state rather ingeniously worked out the theory that by misrepresenting the value of California property the defendant had caused a diminution in the plain-

tiff's funds previously banked here, and expended in making improvements on the California land. ██ As said in *Loranger* v. *Nadeau*, 215 Cal. 363, 366 [10 P.2d 63, 84 A.L.R. 1264]; "It is the settled law in the United States that an action in tort is governed by the law of the jurisdiction where the tort was committed, and as it is a transitory action, it may be maintained in any jurisdiction where the defendant may be found. ██ It is the general rule in tort actions that the court will, if it has jurisdiction of the necessary parties, and can do substantial justice between them in accordance with its own forms of procedure, enforce the foreign law, if it is not contrary to the public policy of the forum, to abstract justice or pure morals, or injurious to the welfare of the people of the state of the forum." To the same effect, *Grant* v. *McAuliffe* (1953), 41 Cal.2d 859, 862 [264 P.2d 944, 42 A.L.R.2d 1162]. The comment on section 412 of the Restatement states: "The right to damages in compensation or punishment for a tort is to be distinguished from the right of access to the courts and from the procedure provided to obtain the damages. The creation of a right to have damages necessarily involves the measurement of that right in so far as the law can measure it. While the actual finding of the amount of damages is a function of the jury or other fact-finding body at the forum, the law that creates the right determines what items of loss are to be included in the damages. Since the right is created by the law of the place of wrong, it is measured by that law."

██ While ordinarily it would be rather anomalous to hold that the law of the forum applies to the allowance of damages but does not apply to the allowance of one of the elements of damages—interest, it must be remembered that when the Supreme Court on the prior appeal applied section 3343, Civil Code, it did so without any issue having been raised as to its application and without any discussion of a reason for its application. While that application became the law of the case as to the general measure of damages, such application should not necessarily be extended to a matter which was not then before the court. Particularly is this so when we realize that the doctrine applied is contrary to prior holdings in this state which were not considered or even mentioned on the prior appeal. Thus, when our courts have considered the matter after issue raised upon the point they have held that damages in a fraud action are to be awarded in accordance with the law of the place

of wrong, thereby following section 412, Restatement. Logically, if California, in effect, adopts the Restatement as to the general measure of damages in a fraud case, it should adopt it as to one of the elements of damages—interest.

 Section 419, Restatement, reads: "The rate of interest allowed as a part of the damages for injury to property by a tort is determined by the law of the place of wrong." Plaintiffs contend it could not apply here (1) because, say they, it deals only with the *rate* of interest, and (2) because, they say, it applies only to injury to property. It seems obvious that if the law of the place of the wrong determines the measure of damages it necessarily must determine whether or not interest may be a part of that measure. The one necessarily includes the other. That a fraud of the kind committed here constitutes an injury to property in the sense of section 419 clearly appears from the definition of "property" given in *Ponsonby* v. *Sacramento Suburban Fruit Lands Co., supra,* 210 Cal. 229. The same meaning is included in the definition of "property" as given in "Introductory Note" to "Property" in Restatement, Conflict of Laws, page 296: "The word 'interest' is used throughout the Restatement of this Subject as indicating the normally beneficial side of a legal relation as a right, power, privilege or immunity. The word 'property' is used throughout the Restatement as a synonym for interest as thus explained." Moreover, section 419 is merely an application of a general principle. The comment on that section says: "The rule stated in this Section is a specific application of the general rule as to measure of damages in tort stated in § 412." That section, as we have heretofore shown, states that the measure of damages for a tort is determined by the law of the place of the wrong.

This brings us to the question of whether the law of Washington, the place where the wrong occurred, permits the allowance of interest.[6]

---

[6]Plaintiffs contend that some of the acts constituting the wrong took place in Michigan where they claim the law allows interest as a matter of right, and also in California. However, the wrong was the misrepresentations. These as well as the sale of the stock occurred only in Washington. No matter where the intention to misrepresent was formed, nor the acts which were misrepresented took place, no wrong was committed until the misrepresentations were communicated to plaintiffs and this took place in Washington. See Restatement, Conflict of Laws, section 377, to the effect that the place of the wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place.

There is no statute on the subject in Washington. No evidence was introduced in the trial court as to the case law in that state upon the subject. Therefore, contend plaintiffs, the California courts may not take judicial notice of the Washington decisions as they are not interpreting statutes but are applying the common law and must assume that the Washington law is the same as California law as expressed in section 3288, Civil Code. Section 1875, subdivision 3, Code of Civil Procedure, as amended in 1927, provides that our courts may take judicial notice of ". . . the laws of the several states of the United States and the interpretation thereof by the highest courts of appellate jurisdiction of such states; . . ." Prior to the amendment, it was held that California courts could not take judicial notice of the decisions in other states. Since the amendment, although there are cases elsewhere that interpret the word "laws" as used in a statute not to include case law in the form of judicial decisions,[7] we have been cited to no case in California, nor have we found one, placing such a narrow interpretation on the word "laws" in section 1875, subdivision 3. On the other hand, in *Worthley* v. *Worthley* (1955), 44 Cal.2d 465 [283 P.2d 19], the court after determining that the effect of a Nevada divorce decree upon the defendant's preexisting obligations under a New Jersey maintenance decree must be decided by the law of New Jersey, took judicial notice, without discussion of its right to do so, of a recent New Jersey Supreme Court decision upon the subject. In *In re Wolfson*, 30 Cal.2d 20 [180 P.2d 326], again without discussion, the court took judicial notice of a Pennsylvania decision holding that the elements of the offense of larceny, under a Pennsylvania statute which made larceny punishable, but did not define it, were those of the common-law offense of larceny. *Bracker* v. *American Nat. Food, Inc.* (1955), 133 Cal.App.2d 338 [284 P.2d 163], after stating "The courts of California take judicial notice of the laws of Missouri," (p. 344) cited a Missouri decision as controlling. *First-Trust Joint S. L. Bank* v. *Meredith* (1936), 5 Cal.2d 214 [53 P.2d 958], was a suit upon a promissory note made in Iowa. After stating that the parties conceded that the question as to whether the defendant was to be

[7]*Swanson* v. *City of Ottumwa,* 131 Iowa 540 [106 N.W. 9, 13, 5 L.R.A. N.S. 360]; *Mooney* v. *Brotherhood of Railroad Trainmen,* 162 Minn. 127 [202 N.W. 341, 342]; *United States Sav. & Loan Co.* v. *Harris,* 113 F. 27, 35.

held personally liable on the note was governed by the law of the state of Iowa, the court said (p. 219): "The law of that state is therefore assumed to be the applicable law [citation] *of which the court will take judicial notice.*" (Emphasis added.) As pointed out in McCormick on Evidence (1954), page 697, the modern conception is that counsel as officers of the court are available to find and present decisions of other states to the judge "in just the same informal and convenient fashion as if they were arguing a question of local law."

That Washington does not allow interest on unliquidated damages in tort cases is clearly apparent from the decisions of that state. See *Ikeda* v. *Curtis* (1953), 43 Wn.2d 449 [261 P.2d 684, 691] (fraud in sale of hotel property); *Kiessling* v. *Northwest Greyhound Lines* (1951), 38 Wn.2d 289 [229 P.2d 335] (negligence in operating a bus); *Buob* v. *Feenaughty Machinery Co.* (1940), 4 Wn.2d 276 [103 P.2d 325, 337] (misrepresentations and breach of warranty concerning a tractor); *Edwards* v. *Powell* (1923), 121 Wash. 598 [212 P. 163] (fraud).

While plaintiffs contend that the decisions on this subject in Washington are "in a state of hopeless confusion" on this subject, we fail to find them so. Volume 30, Washington Law Review 128, cited by plaintiffs, deals only with interest in contract cases. *Mall Tool Co.* v. *Far West Equipment Co.* (1954), 45 Wn.2d 158 [273 P.2d 652], involved an action upon contracts. Likewise *Sweeney* v. *Lewis Const. Co.* (1913), 74 Wash. 303 [133 P. 441], and *Parks* v. *Elmore* (1910), 59 Wash. 584 [110 P. 381]. *Grays Harbor County* v. *Bay City Lbr. Co.* (1955), 47 Wn.2d 879 [289 P.2d 975], is not contrary to the rule above mentioned. It holds that in conversion cases the Washington courts follow the general rule expressed in 36 American Law Reports 2d 337, 348, 349, "the general rule in trover and conversion is that interest is allowed from the date of the conversion." (P. 982 of 289 P.2d.) In *Petersen* v. *Graham* (1941), 7 Wn.2d 464 [110 P.2d 149], interest was allowed for fraud in a real estate transaction because "the demand was a liquidated one." (P. 154.) *Barnett* v. *Cobb* (1926), 140 Wash. 538 [250 P. 57], was an action for rescission for misrepresentation of the rental value of real property. Without discussion or consideration of any Washington cases, the court apparently applied the rule in conversion cases and allowed interest.

Plaintiffs point out that defendants did not raise the

conflict of laws question in the trial court, raising it for the first time on appeal, and hence they claim it may not be raised now. Defendants, however, at all times did maintain that the trial court had no right to grant prejudgment interest. Inasmuch as the question is one strictly of law and not of evidence, we believe that the ruling in *Panopulos v. Maderis*, 47 Cal.2d 337 [303 P.2d 738], should apply and the question should be determined by us. In that case the court said: ". . . the defendant asserts that where a cause has been tried on a theory acquiesced in by the parties, an appellant cannot seek a reversal on an entirely new theory. [Citations.] It is the general rule that a party to an action may not, for the first time on appeal, change the theory of the cause of action. [Citations.] There are exceptions but the general rule is especially true when the theory newly presented involves controverted questions of fact or mixed questions of law and fact. If a question of law only is presented on the facts appearing in the record the change in theory may be permitted. [Citation.] . . . [W]hen as here the facts with reference to the contention newly made on appeal appear to be undisputed and that probably no different showing could be made on a new trial it is deemed appropriate to entertain the contention as a question of law on the undisputed facts and pass on it accordingly." (Pp. 340-341.)

7. *Fairness of Trial.*

(1) Rulings.

(a) Reopening Case for Depositions of Plaintiffs.

Several of the assignments under the contention that defendants were denied a fair and impartial trial are based upon certain rulings of the court. None of the plaintiffs appeared at the trial. Over defendants' objection their testimony, formerly given, was used on the ground of their absence from the state. Defendants moved to strike this testimony, which motion was denied. The case was submitted for decision after briefs filed and oral arguments had, in which defendants again urged the inadmissibility of plaintiffs' former testimony. The judge rendered his decision, giving plaintiffs the same judgment as later entered. Before findings were made, plaintiffs moved to vacate submission, reopen the case, continue it for trial and grant permission to plaintiffs to take their depositions at Seattle. Plaintiffs

stated that there was a remote possibility that defendants' contention as to the admissibility of the former testimony might be good and in an excess of caution desired to eliminate any question. They gave as a reason for not moving to take depositions before submission that they desired to avoid the unnecessary expense which would have been incurred if the court should decide the case in defendants' favor on the merits. The court granted the motion *in toto*, stating that so doing would cure a possible error and would obviate a retrial of the issues in the event the appellate court might agree that the former testimony was inadmissible. Depositions of plaintiffs were thereafter taken, the trial resumed and the depositions read into evidence. Plaintiffs then moved to strike the former testimony of plaintiffs from the record. After the court granted the motion, defendants then offered the stricken testimony for purposes of impeachment and admission, and it was readmitted. Over three years prior to the granting of plaintiffs' motion to take their own depositions defendants had moved to take such depositions and the court had denied the motion on the ground of lack of diligence and insufficiency of the affidavit upon which the motion was based. The conduct of a trial is primarily in the trial court's discretion. We can see no abuse of discretion here. Although the trial court stated that it was fully convinced of the soundness of its ruling on the admissibility of the former testimony, we see no reason why out of an excess of caution, particularly in a case which was now being tried for the third time, and each trial of which consumed a considerable length of time, the court could not permit steps to be taken which would assure that a new trial might not have to be had, not because of a question on the merits, but because of a question of procedure. (See *Bazet* v. *Nugget Bar Placers, Inc.* (1931), 211 Cal. 607, 611 [296 P. 616] ; *Farmer* v. *Orme* (1933), 131 Cal.App. 628, 630 [21 P.2d 977].)[8]

(b) Disregard of Defendants' Evidence.

Defendants contend that Zinn's testimony upon which the court's decision principally depends, was shown to be false

---

[8]Defendants contend at great length that the showing for the admission of the former testimony was not sufficient and therefore it was improperly admitted. We deem it unnecessary to determine this question for two reasons: (1) the court finally struck the testimony from the record, and (2) defendants thereafter for their own purposes had it readmitted.

and is conclusively refuted by defendants' evidence. We cannot say as a matter of law either that Zinn's testimony was false or was refuted by defendants' evidence. ▮ The testimony of one witness, believed by the court, is sufficient to support a judgment. In the deposition of Zinn defendants for the purpose of attacking his credibility attempted to show that he had been in California during some portion of the time the first trial was taking place. That trial extended from 1945 to 1949 during portions only of which time actual trial was taking place. ▮ Defendants failed to show that Zinn was in California during any of the actual trial. We fail to see that the fact that he was here between sessions of the trial affected his credibility to the extent that his testimony as a matter of law must be disregarded.

(2) Remarks of Trial Judge.

In response to an argument by defendants' counsel opposing the taking of the deposition of plaintiffs in which counsel complained of the amount of work thereby falling on their shoulders, the trial judge stated in effect that counsel on neither side should complain about additional work as undoubtedly they would be properly compensated therefor. Then followed a statement by the trial judge that is a little difficult to understand. He started out by saying that third parties reprehensibly had importuned him to disclose his frame of mind toward his ultimate disposition of the case. "The dollar sign has been written—insofar as the suggestion that third parties who might—importune me to commit myself——" Counsel for defendants assumed that the judge was impugning their integrity and so stated. The judge then said that he never had questioned their integrity or good faith nor that of any of the counsel in the case nor of any of the parties, and that no one representing themselves as having been procured by any of the counsel or parties had approached him. The judge then went on to say that he would permit nothing to interfere with a just disposition of the case, and would "pursue a straight, undeviating course in effecting a final disposition of this litigation. . . ." While the remarks should not have been made, we fail to see that they indicated any prejudice towards defendants. The judge in effect so stated. It appears that the judge wanted everyone to know how virtuous he was in spite of third parties' attempted interference. He stated that "in due time" he would state for the record what this importuning was. He did not do so, even when later again requested by defendants

to explain those remarks. He should have done so, but his failure so to do cannot be taken as prejudice towards defendants. Injudicious statements by a trial judge do not necessarily indicate a denial of a fair trial.

(3) Changes in Transcript.

 It appears that the reporter went to the judge's home and asked for assistance in transcribing the above mentioned statements. Defendants' counsel did not agree with the transcription when made, and invited the reporter to their office to question him. Unbeknown to him his statements were recorded by a machine connected with a dictaphone. Apparently the only substantial difference between what the defendants claim the court said and what the transcript shows is as follows: Defendants contend that the judge said ''The dollar sign has been written all over this case,'' the transcript, ''The dollar sign has been written—insofar as the suggestion that third parties who might—importuned me to commit myself——'' We do not consider this difference as significant. Nor do we see anything wrong in the fact that a green reporter who felt he did not get all of the judge's remarks requests and receives assistance from the judge in preparing the transcript.

(4) Judge's Employment of Counsel.

After the trial judge had set aside the submission of the case and while plaintiffs' depositions were being read, the judge stated that an effort was being made to disqualify him from trying a narcotics prosecution then pending, and that he might ask one or more of the counsel in this case to help him resist the charge of disqualification. Thereafter and before this case was finally submitted, he asked Lawrence Livingston, one of plaintiffs' counsel, to assist the attorney who was then acting for him in the criminal case. After considering the alleged disqualification statement, Livingston advised the judge to ask the San Francisco Bar Association to take the burden of the defense and to ask the then president of the Bar Association, Mr. Gerald Levin, who was a member of the firm of attorneys representing defendants herein, to talk to Livingston about the matter. The judge reported to Livingston that Levin would discuss the matter with him. Livingston then contacted Levin, and at the former's request the latter agreed to present the matter to the board of directors of the association. The board declined to enter the proceeding. Thereafter Livingston, at the judge's request, assisted

the judge's attorney in the preparation of the answer to the disqualification charges.

 It certainly was highly irregular for a judge before whom a case was being tried, to employ as his attorney in another matter one of the attorneys in that matter. Although here that employment was open and not surreptitious, that fact does not detract from the impropriety of the action. While we have no reason to doubt the judge's statement that the relationship with Mr. Livingston in no wise influenced him in any way in this case, a judge in the trial of a case should so conduct himself as to leave all of his actions completely above suspicion. The fact that the relationship of attorney and client exists between the judge and a lawyer for the successful side, hardly engenders a comfortable feeling in the losing side. While the judge's action in this respect is highly to be condemned, we do not feel that it requires us to hold that it influenced him in his determination of this case.

Those portions of the judgment allowing interest prior to judgment are reversed. In all other respects the judgment is affirmed. Each party shall bear its own costs.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied February 28, 1957, and appellants' petition for a hearing by the Supreme Court was denied March 27, 1957. Traynor, J., was of the opinion that the petition should be granted.