Filed 4/20/21  Davis v. Hosaka Nagel & Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAIMIE DAVIS,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>HOSAKA NAGEL & CO., et al.,<br><br>　　Defendants and Respondents. | D076593<br><br><br>(Super. Ct. No. 37-2014-00024074-CU-RI-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E. L. Strauss, Judge.  Affirmed.

Jaimie Davis, in pro. per., for Plaintiff and Appellant.

Williams Iagmin and Jon R. Williams, for Defendants and Respondents.


Jaimie Davis (Davis) sued her tax advisors Roy Hosaka (Hosaka) and Hosaka Nagel & Company (Hosaka Nagel) (collectively, Respondents) for fraudulent concealment and breach of fiduciary duty after she suffered investment losses.  Davis alleged Respondents fraudulently induced her to purchase high-risk investments and failed to disclose material information

about their relationship with the individuals and companies selling the investments. A jury returned a verdict in favor of Respondents on both causes of action. After denying Davis's motion for a new trial, the trial court entered judgment on the verdict.

Davis appeals from the judgment. She contends the trial court erred by excluding evidence related to a separate Securities and Exchange Commission (SEC) enforcement action against one of the companies with which Davis invested, the jury's verdict is not supported by the evidence, and the court erred by denying her motion for a new trial. We conclude Davis has not met her burden to establish error on appeal and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Overview of the Litigation*

After starting a successful medical consulting business, Davis began investing her money in rental properties and traditional investment accounts. With the goal of early retirement, Davis sought out more personalized investment advice. She met Curtis Sathre (Sathre), a licensed broker and investment advisor, in 2004. At the time, Sathre was a senior financial planner with Western Financial Planning Corporation (WFPC) and a registered representative of WFP Securities. WFPC and WFP Securities were related entities; Louis Schooler (Schooler) owned WFPC and co-owned WFP Securities with his brother, John Schooler. WFPC sold investments in raw undeveloped land through a series of general partnerships and WFP Securities sold a broader range of investments, including investments in oil and gas drilling programs.

Sathre became Davis's investment broker. In December 2004, Davis purchased her first investment with Sathre, a natural gas well project called

Texas Keystone 2004. She also made investments in a medical billing company (Medical Capital), an apartment building (Castle Pines), and a general partnership related to the purchase of undeveloped land (WFPC Grandview) based on Sathre's recommendations.

In February 2005, Sathre referred Davis to his certified public accountant (CPA), Hosaka at Hosaka Nagel, for tax advice. Hosaka Nagel prepared Davis's tax returns for approximately five years, from 2005 to 2010. During that time, Hosaka Nagel also provided tax and accounting services to Sathre, Schooler, WFPC, and several WFPC general partnerships.

Davis continued to make investments with Sathre and ultimately invested approximately $2.4 Million between 2004 and 2008. Of relevance here, Davis invested in another natural gas program (Texas Keystone 2005), five other oil and gas programs (Reef Oil & Gas, Discovery South Central, Waveland Drilling Partners 2006-A, Striker Petroleum, and Patriot Minerals Arapaho), and three real estate investment programs (DBSI Denton Court, Behringer Harvard Opportunity REIT, and Desert Capital REIT).

In 2009, Davis learned the SEC was investigating Medical Capital and that two of her other investments, Striker Petroleum and DBSI Denton Court, were not performing well. In February 2010, Davis filed an arbitration claim against Sathre and WFP Securities with the Financial Industry Regulatory Authority (FINRA) to recover her investment losses. She alleged fraud in connection with Medical Capital, Striker Petroleum, and DBSI Denton Court.[1]

---

[1] Davis did not recover any damages in the FINRA arbitration. However, that information was not presented to the jury because the trial court granted Davis's motion in limine to exclude evidence of the arbitration outcome.

3

Meanwhile, in early 2011, Hosaka retired and Hosaka Nagel sold its business.  Thereafter, neither Hosaka nor Hosaka Nagel performed any further tax and accounting work for Davis or any other client.

In July 2014, Davis filed the present lawsuit against Hosaka and Hosaka Nagel.  She alleged Respondents fraudulently induced her to purchase "lightly regulated" high-risk investments with Sathre and WFP Securities.  According to Davis, Respondents knew the investments were "extremely risky" or "Ponzi schemes" because they served as the CPA for the individuals and entities selling the investments and therefore had access to confidential information that revealed the investments were "not financially viable."  Specifically, Davis alleged Hosaka Nagel served as the auditor for certain general partnerships formed by WFPC involving investments in unimproved land.  Davis further alleged Respondents concealed a referral relationship with Sathre and WFP Securities, whereby Respondents collected fees and commission for recommending the fraudulent investments promoted by Sathre and WFP Securities.

Based on these allegations, Davis asserted causes of action for fraudulent concealment and breach of fiduciary duty against Respondents.[2] Davis sought damages for losses she incurred in twelve investments: Medical Capital, Texas Keystone 2004, Texas Keystone 2005, Reef Oil & Gas, Discovery South Central, Waveland Drilling Partners 2006-A, Striker Petroleum, Patriot Minerals Arapaho, DBSI Denton Court, Behringer Harvard Opportunity REIT, Desert Capital REIT, and Triple Net Opportunity Fund.

---

[2]    Davis also asserted a cause of action under the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, et seq.), but dismissed that claim before trial.

4

In defense, Respondents asserted they provided tax advice and not investment advice to Davis and therefore were not responsible for any investment losses she incurred.

Trial began February 14, 2019, and eleven days later the jury returned a complete verdict for Respondents. In the special verdict form, the jury specifically found that Respondents did not "intentionally fail to disclose a[ny] fact that Jaimie Davis did not know and could not reasonably have discovered" and that Respondents did not breach any fiduciary duty owed to Davis. The trial court denied Davis's motion for a new trial and entered judgment for Respondents on June 17, 2019. Davis timely appealed.

## II.

### *Summary of Relevant Trial Testimony*

Because Davis challenges the sufficiency of the evidence supporting the jury's verdict, we summarize the relevant testimony of key witnesses from the trial.

A. *Fact Witnesses*

1. *Robert Phalen*[3]

Robert Phalen (Phalen) was a client of both Sathre and Hosaka. Phalen began investing with Sathre in 2007. Phalen had previously invested in rental properties and Sathre encouraged him to mortgage those properties and invest the funds in oil and gas and raw land deals. Sathre told Phalen that he needed an accountant who understood the investments he was making and referred him to Hosaka.

---

[3] Robert Phalen was a named plaintiff in the lawsuit but settled his claims on the eve of trial. He is not a party to the appeal.

Phalen met with Hosaka in June 2007. Hosaka "praised Sathre" and told Phalen he was "lucky to have gotten into such good deals." Hosaka "looked at all the investments" he made with Sathre and said "they were great investments," but warned Phalen that he was "going to have some issues with income tax because these investments would be throwing off a lot of money." Hosaka told him to diversify his investments and that oil and gas and raw land would be "ideal" investments for Phalen, and he would also gain tax advantages from those types of investments. Hosaka encouraged Phalen to talk to Sathre about these investments. Hosaka also suggested Phalen invest in an avocado farm for the tax deductions, but Phalen was not interested.

Phalen was Hosaka's client for one year and had met with Hosaka only twice, in July 2007 and February 2008. During that time, Hosaka did not tell Phalen he had any type of relationship with Sathre or any company affiliated with Sathre. However, Sathre told Phalen that Hosaka also did his taxes when he referred Phalen to Hosaka.

Phalen acknowledged that 14 of the 17 investments he made with Sathre were purchased before he ever met Hosaka. Hosaka never told Phalen to buy or sell an investment in any particular company or program, and Hosaka's advice centered around the tax advantages of certain types of investments. Finally, Phalen testified Hosaka never indicated any of his investments were "safe" or otherwise discussed the level of risk associated with those investments.

### 2. *Jaimie Davis*

Davis met with Sathre in late 2004 to discuss her investment goals. She told Sathre that she wanted to invest her money so she could "live off the

money" when she retired.  Between 2004 and 2008, Davis invested approximately $2.4 Million with Sathre.

For each investment at issue in this litigation, Sathre provided Davis with a private placement memorandum (PPM) which laid out the risks for the investment.  Apparently, each PPM would contain approximately 10 pages devoted to explaining the risk factors.  In at least some of the PPMs she read, Davis was warned: " 'This isn't reviewed by any governmental agency.  You could risk losing all your money and this is highly risky.' " According to Davis, however, Sathre "explained away" the language and assured her the investments were sound.  Sathre continued to provide PPMs for each of her subsequent investments, but Davis stopped reading them at some point and instead relied on Sathre's advice.

Additionally, for each investment she purchased, Davis received and signed a subscription agreement before purchasing.  The subscription agreement would also contain an explanation of the risk factors. For example, the subscription agreement for Texas Keystone 2004 contained the following language:  " 'Investment in the partnership is speculative due to the nature of the partnerships proposed drilling activities and involves a high degree of risk of loss.' "  Davis stated many times she only received the signature pages to sign but acknowledged the explanation of the risk factors were probably provided when she signed the subscription agreement for Texas Keystone 2004.  Davis stated she would not have purchased the investments had she known they were "highly risky."

When she began investing with Sathre, he told Davis the person preparing her taxes did not have enough knowledge about the proposed investments, and she needed someone " 'more experienced' " who could review her "whole financial picture" and make recommendations based on the

"global . . . picture" of her taxes and investments.  So Sathre referred Davis to Hosaka in February 2005.

At their initial meeting in April 2005, Hosaka told Davis that Sathre was a "good advisor" and " 'would never steer [her] wrong.' "  Hosaka assured Davis that he would work with Sathre to help her reach her goals and that " 'Sathre's products are good.' "  In addition to doing her taxes, Hosaka told Davis, " 'We'll go over your investments.  And if I ever see anything that doesn't fit, I'll let you know that it doesn't meet your goals.  I'll let you know.  We'll work it out and we'll make sure you stay on track.' "  According to Davis, Hosaka "would always brag about his investment knowledge."

Davis hired Hosaka for her personal taxes and later brought over the business from her medical consulting company for tax and accounting services.  Whenever Davis took a distribution from her company, Hosaka would suggest that she ask Sathre about additional oil and gas, bond, or real estate investments.  According to Davis, they "always" talked about the investments when they met and it would generally be about how the investments she already made were doing.  Hosaka "always" sent her back to Sathre to see what other investments he had, but Hosaka never recommended that she purchase any specific investment, only "categories of investments" such as a bond or oil and gas.  On one occasion, however, Hosaka specifically told Davis to ask Sathre about a second Medical Capital investment.

Hosaka did not disclose to Davis that he had any type of professional relationship with WFPC or that he was friends with Sathre, Schooler, "and all these guys for over 40 years."  Had she known of the relationships, Davis would have understood that Hosaka had personal motivation to say what he did about the investments and it "was just a sales pitch."  She first learned

8

Hosaka had a relationship with WFPC when she overheard Sathre and Schooler talking about Hosaka in the hallway during the FINRA arbitration in 2011.[4] She heard from Phalen, who was at the arbitration, that he was also a client of Hosaka and Sathre, and that Hosaka said similar things to Phalen about his investments with Sathre. At that point, Davis believed that Hosaka might have engaged in some type of wrongdoing. She later learned that Hosaka had been the CPA for one of the WFPC land investment entities.

Davis acknowledged the engagement letters she signed with Hosaka Nagel was for the preparation of her tax returns, and not for investment advice. When asked if she had any written evidence of receiving investment advice from Hosaka or Hosaka Nagel, Davis pointed to an e-mail she received from Hosaka Nagel indicating oil and gas investments were good investments. She believed the email constituted investment advice. When pressed, however, Davis conceded she was only copied on the email and the attached letter, which was addressed " 'To Whom It May Concern' " and sent to a mortgage broker on a separate land purchase she had made. The purpose of the letter was to explain the tax consequences of intangible drilling costs (IDCs) associated with certain oil and gas investments she had made. There was nothing in the letter suggesting she should buy, or sell, additional oil and gas investments. Other than that email and letter, Davis also pointed to a brochure about investing in alpacas that she claims Hosaka gave her as written evidence of Hosaka's investment advice.

---

[4]    Davis generally stated she heard Sathre talking with "other guys who were with Western." Throughout the trial, several witnesses, including Davis, used general terms to refer to the various related entities. We have attempted to discern the meaning of those terms from the overall record but are limited by the precision of the testimony itself.

### 3. *Curtis Sathre*

Sathre first referred Davis to a tax advisor in Orange County, where she lived, because she was unhappy with her CPA. Sathre only referred her to Hosaka after she asked who did his personal taxes. Sathre denied he had any relationship with Hosaka to "split a commission" on referrals from Hosaka. Indeed, while Sathre believes he referred a little more than ten clients to Hosaka, Hosaka has never referred a client to him.

Sathre described Davis as "a very sophisticated investor." She was a licensed real estate broker, worked as a CFO "making 300,000 a year," and handled "her own complicated transactions." From the start, Davis told Sathre she wanted "nonstock market investments." She felt she had the expertise to invest in the traditional stock market herself and she "really wasn't enamored with the stock market." Instead, she asked Sathre to introduce her to "alternative investments." Sathre encouraged Davis to consider traditional stock market investments "but she never had an appetite for them."

Sathre explained that the investments Davis purchased were not considered safe; they were "at least aggressive" if not "highly risky." For each investment, Davis received subscription documentation, which she signed, that set out "[i]n bold, big, larger print than everything else on the page" that the investment was risky. Sathre did not tell Davis to dismiss the language as "boilerplate." Rather, he "spent a lot of time on the risk factors" with Davis. He never told Davis "there were no risks involved or that [the investments] were safe."

Sathre personally invested in the WFPC partnerships that bought raw land and in the other funds that he recommended to Davis, including approximately eight of the twelve investments that are the basis of Davis's

10

lawsuit—Behringer Harvard Opportunity REIT, Triple Net Opportunity Fund, Texas Keystone 2004, Texas Keystone 2005, Desert Capital REIT, Striker Petroleum, Reef Oil & Gas, and Discovery South Central.

Sathre explained that investments were, at times, tax driven and, in such cases, the client would discuss the merits of a specific investment with him but that "would not be part of the conversation with the accountant." The client would have a separate discussion with the accountant on "verifying how [the investment] would affect their specific tax situation." Davis had those types of discussions with her accountant, presumably Hosaka, and Sathre specifically recalled discussions regarding how IDCs related to her oil and gas investments would affect her tax returns. Davis, however, made the final decision regarding the investments.

After Davis began working with Sathre, she referred her mother, father, and stepfather to Sathre for investment advice. At the time of trial, Sathre was still advising Davis's mother and last spoke with her a week before he testified.

4.    *James Nagel*

James Nagel (Nagel) testified as a company representative for Hosaka Nagel. He explained that Hosaka Nagel gave tax advice, which would include the tax consequences of certain types of investments, but that, as a rule, Hosaka Nagel did not provide any investment advice. However, because Hosaka did all of his own client interviews, Nagel would not know whether Hosaka provided investment advice to any of his clients.

Nagel testified that a CPA is prohibited from giving a tax client "investment advice" because it is not part of their license. He would consider it improper and "prohibited investment advice" to tell a tax client they should invest in a particular type of investment, such as raw land or oil and gas, or

11

to indicate the investments they had were "really good investments." It would also not be within the scope of the firm's tax services to "evaluat[e] the quality" of their clients' investments or to advise a client to make investments for diversification.

Nagel explained, however, that advising a client on the tax consequences of specific investments was an important aspect of the firm's services, but that such advice would not include an evaluation of the viability of any particular investment. For example, telling a client to put money into an IRA or 401k account would be within the scope of tax advice, but telling a client to purchase certain investments within such an account would go beyond tax advice into the area of improper investment advice. He explained that a letter like the one Davis was copied on, explaining how IDCs impacted her tax return, would be considered tax advice as opposed to investment advice.

### 5. *Roy Hosaka*

Hosaka was not available to testify in person, but both parties played video excerpts from his prior depositions for the jury.[5]

Hosaka stated he was not qualified to provide investment advice and, therefore, would never provide advice about a specific investment or a specific financial advisor to his clients. He focused his clients on "retirement planning" and specifically encouraged them to regularly contribute to traditional investment vehicles, such as 401(k) and IRA accounts. Investment advice, however, "was totally out of [his] realm."

---

[5] We hereby grant Davis's unopposed motion to augment the record with the transcripts of the deposition testimony played at trial. (See Cal. Rules of Court, rule 8.155(a)(1)(A).)

Hosaka did not, as far as he can recall, discuss Davis's "investment needs" with her. He never advised any of his clients to buy oil and gas. Indeed, he believed oil and gas "were not good investments" because they were highly speculative in nature, but they could provide significant tax write-offs.

Hosaka confirmed he had known Schooler and Sathre a long time. Other than prepare their personal tax returns, Hosaka did not do any work for Schooler or Sathre. Hosaka Nagel prepared financial statements and tax returns for WFPC and certain related real estate partnerships but did not work on any of the oil and gas partnerships.

Hosaka never disclosed to Davis, or any individual taxpayer clients who invested with WFPC or WFP Securities, that he performed CPA work for WFPC, Sathre, or Schooler. Hosaka explained that kind of information was "confidential." Hosaka was never contacted by FINRA or the SEC regarding claims against WFPC or Schooler.

B.    *Expert Witnesses*

1.    *Douglas Aguilera*

Douglas Aguilera (Aguilera) testified as an expert witness on behalf of Davis. Aguilera was an auditor with extensive experience in fraud investigations. He opined that Respondents failed to comply with the American Institute of Certified Public Accountants (AICPA) Code of Professional Conduct by endorsing the investments Davis purchased from Sathre, without informing Davis that Hosaka also provided tax services to Sathre, Schooler, WFPC and WFPC related entities. He further opined that Hosaka failed to comply with the AICPA Code by providing investment advice that he was not qualified to provide.

13

Aguilera admitted he had no professional experience related to a CPA's duties to disclose conflicts of interest. He also stated the issue of a CPA providing investment advice to a tax client was a "gray area." Finally, he agreed his opinions were based on multiple assumptions, including that Davis was telling the truth.

### 2. *Jolene Fraser*

Jolene Fraser (Fraser) testified as an expert witness on behalf of Hosaka Nagel. Fraser holds a CPA license and has a certified financial forensics designation and a certified fraud examiner designation from the AICPA. She works with the Accounting Standards and Auditing Standards Committee that provides review and input on suggested changes to the AICPA standards.

She opined there was no conflict of interest and no evidence Hosaka gave Davis advice that would be considered investment advice as opposed to tax advice. In addition, Fraser indicated that Sathre disclosing to Davis that Hosaka did his taxes was the same as Hosaka disclosing that information to her.

## DISCUSSION

### I.

### *General Principles of Appellate Review*

Our review is limited by the standards and presumptions that involve substantial deference to the trial court on its discretionary decisions, and to the trial court and the jury on the resolution of factual issues. We begin with the cardinal rule that the trial court's ruling is presumed correct and all ambiguities are resolved in favor of affirmance. (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631 (*Winograd*).) As

14

the party seeking reversal, the appellant carries the burden to overcome the presumption of correctness and show prejudicial error.  (*Winograd*, *supra*, at p. 632.)

On appeal, "[w]e do not reweigh evidence or reassess the credibility of witnesses."  (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246 (*Babick*).)  "We are 'not a second trier of fact.' "  (*Ibid*.)  We defer to the judge or jury's resolution of factual issues as they have had the benefit of observing the demeanor of the witnesses and are therefore in a better position to assess credibility.  (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622 (*Johnson*) ["Credibility is an issue for the fact finder."].)

Because it is the appellant's burden to affirmatively demonstrate error, she must provide citations to the appellate record directing the court to the evidence supporting each factual assertion.  (Cal. Rules of Court, rule 8.204(a)(1)(C); *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205 ["It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations."].)  The appellant must also set forth an adequate "summary of the significant facts limited to matters in the record."  (Cal. Rules of Court, rule 8.204(a)(2)(C).)  In doing so, the appellant must set forth all material facts and evidence, including facts and evidence damaging to the appellant's position.  (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.)  The reviewing court is not required to develop appellant's arguments or search the record for supporting evidence and may instead treat arguments that are not developed or supported by adequate citations to the record as waived.  (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1011 (*ComputerXpress*) ["It is not the duty of a reviewing court to search the record

15

for evidence on a point raised by a party whose brief makes no reference to the pages where the evidence can be found."].)

An appellant who represents herself, as Davis does here, "is entitled to the same, but no greater, consideration" as any other attorney or litigant on appeal and is required to follow the rules. (*Nelson v. Gaunt* (1981) 125 Cal.App.3d 623, 638 (*Nelson*); *McComber v. Wells* (1999) 72 Cal.App.4th 512, 523 ["Although (appellant) is representing herself in this appeal she is not entitled to special treatment and is required to follow the rules."].)

Respondents assert that Davis has violated fundamental rules of appellate procedure, including failing to properly support factual assertions with record citations, arguing facts outside the record, and failing to provide an adequate summary of facts and evidence to support her contentions on appeal and instead presenting only favorable facts while ignoring damaging evidence.[6] We agree that Davis has generally failed to comply with the applicable rules of appellate practice and we address her arguments with the foregoing principles in mind. Ultimately, we conclude Davis has failed to overcome the presumption of correctness and affirmatively establish error on appeal.

---

[6] In response, Davis asserts that Respondents have routinely misrepresented the record. Respondents present the facts in a light most favorable to their position, and the jury's verdict, as they are entitled to do on appeal, but we do not agree that they have materially or intentionally misrepresented the record. Regardless, neither party seeks any specific relief in connection with the alleged rule violations.

### *The Trial Court Did Not Abuse its Discretion by Granting Respondents' Motions in Limine Nos. 2, 5, and 12*

Davis asserts the trial court erred by granting three motions in limine and excluding evidence related to an enforcement action brought by the SEC against Schooler and WFPC in 2012. She contends this was structural error requiring reversal per se because it denied her the right to present her case and, thus, the right to a fair trial. We summarize the SEC enforcement action before turning to Davis's contentions.

A. *The 2012 SEC Enforcement Action Against Schooler and WFPC*

The SEC alleged WFPC and Schooler defrauded unsophisticated investors by purchasing raw undeveloped land and then selling multiple investments in the land at grossly inflated prices through a series of general partnerships. Although Schooler asserted he only bought properties if he could buy them for a significant discount and, thus, the fair market value was in fact significantly higher than the purchase price, the SEC alleged the comparable properties he relied upon were not really comparable.

As a result of the SEC action, the United States District Court for the Southern District of California placed WFPC under receivership and appointed Thomas Hebrank (Hebrank) as the receiver.

In June 2015, the district court granted in part the SEC's partial motion for summary judgment. The court found Schooler and WFPC had knowingly misrepresented the value of one specific property, the Stead property. Around the same time, in a ruling on a separate motion for partial summary judgment based on unregistered securities violations, the court ordered disgorgement of approximately $136 million in funds raised from investors. There was no finding of fraud associated with the disgorgement

17

ruling and, based on the record before us, it appears the court did not make any further findings of fraud or misrepresentation.

B.    *Standard of Review*

We review a trial court's ruling on the admissibility of evidence, whether in limine or during trial, for abuse of discretion.  (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)  The trial court has broad discretion in admitting or rejecting proffered evidence and its decision will not be reversed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice.  (See Cal. Const., art. VI, § 13; *People v. Hall* (1980) 112 Cal.App.3d 123, 127; *People v. Wein* (1977) 69 Cal.App.3d 79, 90.)  Whenever the trial court has discretionary power to decide an issue, its decision will not be set aside "as long as there exists 'a reasonable or even fairly debatable justification, under the law, for the action taken,' " even if the appellate court " 'might feel inclined to take a different view from that of the court below as to the propriety of its action.' "  (*Gonzales v. Nork* (1978) 20 Cal.3d 500, 507 (*Gonzales*), quoting *Harrison v. Sutter St. Ry. Co.* (1897) 116 Cal. 156, 161.)  In other words, an appellate court will interfere with the trial court's exercise of discretion only when it concludes that under all the evidence, viewed most favorably in support of the decision, "no judge could reasonably have made [the challenged decision]."  (*Newbauer v. Newbauer* (1949) 95 Cal.App.2d 36, 40.)

Davis, however, appears to argue we should apply a de novo standard of review.  She asserts the trial court's evidentiary rulings resulted in the exclusion of "an entire class of relevant evidence" and therefore she was denied her due process right to present her case.  Relying on *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659 (*Kelly*), Davis argues this is structural error and reversible per se.  Davis misunderstands *Kelly*.  In *Kelly*,

the court first considered whether the trial court's evidentiary rulings constituted an abuse of discretion and then, only after concluding that it did, the court further considered whether the error required reversal. (*Id*. at p. 677.) Because the court in *Kelly* found that the trial court "had effectively excluded *any* presentation of evidence on liability," it then determined the error resulted in a miscarriage of justice and required reversal per se. (*Id*. at pp. 668, 677, italics added.) Similarly, here, we must first consider whether the trial court abused its discretion by granting the relevant motions in limine before considering whether reversal is required as a result of any associated error.

C.     *Analysis*

Davis sought to rely on the SEC action as evidence of material information Hosaka knew, or should have known, but did not disclose to her and to establish when she became aware of the SEC action insofar as that knowledge pertained to a statute of limitations defense. She noticed Hebrank as a trial witness. Respondents brought motions in limine to preclude Hebrank from testifying (MIL No. 2), to exclude any reference to the WFPC investments as being " 'fraudulent' " based on the SEC action (MIL No. 5), and to exclude any testimony, documents, argument, or reference to the SEC action (MIL No. 12).

The trial court granted all three motions with some limited exceptions. Specifically, the court allowed Davis to offer evidence as to what Hosaka actually knew about any investment she made based on the work he did for WFPC and when she became aware of the SEC action in support of her statute of limitations defense.

We begin our analysis with the trial court's ruling on MIL No. 12, which sought to exclude any testimony, documents, argument, or reference to the SEC action, as it is the broadest of the motions at issue.

1.    *Motion in Limine No. 12*

In granting MIL No. 12, the trial court considered that the SEC action occurred several years after the events underlying Davis's claims and that Respondents were not parties to the SEC action.  The court therefore concluded evidence of the SEC action would be more prejudicial and confusing than probative.  (See Evid. Code, § 352.)  We agree with the trial court's analysis and find no abuse of discretion in the trial court's ruling.

The SEC action was filed in 2012, approximately one year after Hosaka retired and Hosaka Nagel had ceased performing work for any client. Neither Hosaka nor Hosaka Nagel were parties to the SEC action; Hosaka testified at his deposition that he was never contacted by the SEC regarding Schooler or WFPC, and Davis presented no evidence indicating any of the Respondents were involved in the SEC action.

Further, the SEC action centered around WFPC land investments and, although Davis did invest in some WFPC land investments during the relevant time period, she was not seeking damages against Respondents related to any of those investments.  Further still, there was no evidence indicating Davis made any investment in the Stead property, the only property about which the district court made any specific factual findings.

Davis asserts evidence from the SEC action included findings regarding the structure of the WFPC land investments and there was reason to believe Hosaka knew about the structure of those investments as he was the CPA for WFPC and several of the related general partnerships.  However, Davis did not establish any connection between the investments at issue in the SEC

20

action and any investment she alleged Hosaka advised her on, beyond the mere association of the related WFPC entities. Moreover, Davis's last meeting with Hosaka occurred in 2010, approximately two years before the SEC action was filed and, thus, there is nothing in the record to suggest that Hosaka had knowledge of the allegations set forth in the SEC action when he advised Davis.

In sum, the SEC action involved different parties, different investments, and occurred long after the allegedly improper advice that formed the basis of Davis's allegations against Respondents. Thus, it was reasonable for the trial court to conclude the SEC action was not relevant to Davis's claims in this litigation and there was potential for the jury to be confused or misled by the unrelated findings made by the district court. (Evid. Code, §§ 210, 352; *Gonzales*, *supra*, 20 Cal.3d at p. 507.) Accordingly, the trial court did not abuse its discretion in precluding Davis from presenting evidence related to the SEC action.

### 2. *Motion in Limine No. 5*

MIL No. 5 was more specific and sought to preclude Davis from relying on the SEC action to broadly assert that all WFPC investments were fraudulent.

As previously discussed, and as Davis's trial counsel conceded, there was no specific finding by any tribunal of fraud associated with any investment at issue in the present litigation. The trial court correctly concluded there was no basis for use of the term "fraudulent" with respect to the WFPC investments and granted the motion. For largely the same reasons already discussed with respect to MIL No. 12, we find no abuse of discretion in the trial court's ruling.

21

Davis asserts there were findings in the SEC action suggesting Schooler and WFPC engaged in widespread improper business practices, which Davis characterizes as "fraudulent." To the contrary, the district court in the SEC matter did *not* make findings of widespread fraud. Instead, the court found that Schooler and WFPC misrepresented the value of one specific property, the Stead property, which Davis did not invest in, and subsequently ordered disgorgement based on unregistered securities violations. Moreover, the court specifically noted in the disgorgement order that disgorgement was appropriate "even in the absence of fraud." Accordingly, we agree with the trial court that it would be unduly prejudicial to characterize all of the WFPC land investments as fraudulent as a result of the SEC action.

As with MIL No. 12, Davis asserts the ruling on MIL No. 5 precluded the jury from hearing evidence that would have shown Respondents failed to disclose material facts they knew or should have known. To the contrary, the court specifically ruled that Davis could present evidence regarding "what [Hosaka] did . . . know about anything that she invested in and he did tax returns on." In doing so, the court properly limited Davis to evidence relevant to the claims at issue.

3. *Motion in Limine No. 2*

Finally, MIL No. 2 sought to preclude Hebrank, the court appointed receiver in the SEC action, from testifying at trial. The trial court granted the motion after noting Hebrank was not designated as an expert, that his knowledge was based primarily on the review of documents in the SEC action, and, therefore, any lay opinion he had would be based on impermissible hearsay. Again, we agree with the court's analysis and find no abuse of discretion in the ruling.

22

Davis failed to designate Hebrank as an expert. Accordingly, Hebrank would be limited to presenting lay opinions rationally based on his personal knowledge and perceptions. (See Code Civ. Proc., §§ 2034.260, 2034.300; Evid. Code, §§ 702, subd. (a), 800.) However, there was no indication Hebrank had any independent or first-hand knowledge of WFPC's business practices, or what Hosaka Nagel knew about those practices, and, instead, as Davis conceded, Hebrank's knowledge and perceptions were primarily based on his review of documents in the SEC action. As such, any relevant testimony he could offer would have been based on impermissible hearsay. (See Evid. Code, § 1200.)

Davis asserts Hebrank could have authenticated his own forensic reports and other business records of WFPC. As the trial court noted, it was not likely he could authenticate WFPC records as he was not the custodian of those records, and he therefore did not have first-hand knowledge of how they were created. (*Sierra Managed Asset Plan, LLC v. Hale* (2015) 240 Cal.App.4th Supp.1, 8 [to establish business records exception, a qualified witness must possess sufficient personal knowledge of the identity and mode of preparation of the documents]; cf. *People v. Fowzer* (1954) 127 Cal.App.2d 742, 747-748 [assistant cashier with direct access to bank records could lay foundation and testify regarding those records].) Although Hebrank may have been qualified to testify about the reports he himself made, as receiver, those reports were created in connection with the SEC action, in or after 2012, and therefore were not relevant to the present litigation.

In any event, any testimony Hebrank would have offered as the receiver in the SEC action was, by definition, related to the SEC action, and therefore would have been properly excluded for the reasons already discussed with respect to MIL No. 12.

23

4. *The Exclusion of Evidence Related to the SEC Action Did Not Preclude Davis From Presenting Her Case*

As a final matter, Davis asserts the trial court's erroneous rulings on the motions in limine effectively precluded her from presenting "an entire class of evidence" that was fundamental to proving her claims. Relying on *Kelly, supra,* 49 Cal.App.4th at page 677, she contends the rulings are therefore subject to reversal per se. First, for the reasons already discussed, we conclude there was no error. To the contrary, evidence related to the SEC action was not particularly relevant, let alone fundamental, to Davis's claims. In any event, the trial court specifically allowed Davis to present evidence on what Hosaka *actually* knew about any investment she made based on the work he did for WFPC[7] and on when she became aware of the SEC action to support her statute of limitations defense. Unlike *Kelly*, where the trial court excluded "*any* presentation of evidence on liability," the court in this trial did not exclude an entire class of relevant evidence. (Compare *Kelly, supra,* at pp. 668, 677, italics added.)

We therefore conclude Davis has not met her burden on appeal to establish that the trial court erred in its evidentiary rulings or that reversal is required as a result.

---

[7]    During oral argument, Davis asserted the trial court later "gutted" the exception he allowed by precluding Hosaka's testimony regarding what he actually knew about investments she made based on the work he did for WFPC. The court did subsequently exclude three excerpts from Hosaka's deposition testimony, but none of the proffered excerpts constitute such evidence. Instead, the excerpts address what Hosaka would have done *if* he learned a client was committing fraud, which—the court correctly ruled—was an incomplete hypothetical and lacked foundation.

# III.

*Substantial Evidence Supports the Jury's Verdict*

A. *Standard of Review*

Davis argues the jury's verdict in favor of Respondents was not supported by the evidence. We review a challenge to the jury's verdict and its resolution of disputed factual questions under the substantial evidence standard. (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100 (*Oregel*).)

"When findings of fact are challenged in a civil appeal, we are bound by the familiar principle that 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.]." (*Oregel, supra*, 90 Cal.App.4th at p. 1100.) In applying this standard, "[w]e view the evidence most favorably to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*Ibid.*) "Substantial evidence is evidence of ponderable legal significance, reasonable, credible, and of solid value." (*Ibid.*) "Substantial evidence, of course, is not synonymous with 'any' evidence." (*Toyota Motor Sales U.S.A., Inc. v. Super. Ct.* (1990) 220 Cal.App.3d 864, 871.) "[T]he focus is on the quality, not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantial.'" (*Id.* at pp. 871-872.) The testimony of a single witness, standing alone, can be substantial evidence to support the jury's verdict. (*Zinn v. Ex-Cell-O Corp.* (1957) 148 Cal.App.2d 56, 85 (*Zinn*).) And as we stated at the outset, we do not reweigh the evidence or reassess the credibility of witnesses. (*Babick, supra*, 229 Cal.App.4th at p. 1246; *Johnson, supra*, 28 Cal.App.4th at p. 622.)

Importantly, and overlooked by Davis here, "when a losing party challenges the verdict for a lack of substantial evidence, they 'must set forth, discuss, and analyze *all* the evidence on that point, *both favorable and unfavorable.*' " (*Babick*, *supra*, 229 Cal.App.4th at p. 1246.) It is Davis's "fundamental obligation to this court, and a prerequisite to our consideration" of her challenge to the jury verdict, to set forth the version of events *most favorable* to Respondents. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) Instead, Davis turns this standard of review on its head. She argues there is evidence "that proved a verdict for Davis was warranted," sets forth merely her own evidence and reweighs the evidence and credibility of witnesses. However, even disregarding the failure to follow fundamental principles of appellate review, we conclude Davis has failed to meet her burden of establishing the verdict was not supported by substantial evidence.

B.    *Analysis*

To prove her claim for fraudulent concealment, Davis needed to prove Respondents concealed or suppressed a material fact that they had a duty to disclose with the intent to defraud Davis, that she was unaware of the concealed fact, and that she suffered damages as a result. (See *Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 606.) With respect to her claim for breach of fiduciary duty, Davis needed to prove Respondents owed her a fiduciary duty, that Respondents breached that duty, and that she was damaged as a result. (See *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 646.) The jury ultimately concluded Davis did not prove either claim. Specifically, as to her claim of fraudulent concealment, the jury found that Respondents did not "intentionally fail to disclose a[ny] fact that Jaimie Davis did not know and could not reasonably have discovered." On her

26

second claim, the jury found that Respondents did not breach any fiduciary duty owed to Davis.

Although Davis failed to present a fair description of the evidence, it is apparent from our own careful review of the record that there was substantial, if not overwhelming, evidence to support the jury's findings. We do not attempt to exhaustively discuss every item of evidence that supports the jury's verdict. (*ComputerXpress*, *supra*, 93 Cal.App.4th at p. 1011 ["It is not the duty of a reviewing court to search the record for evidence on a point raised by a party whose brief makes no reference to the pages where the evidence can be found."].) Rather, we highlight three central and dispositive facts the jury decided in Respondents' favor.

Both of Davis's claims are premised on the following three factual assertions: 1) Respondents provided her with improper or fraudulent investment advice; 2) Hosaka concealed a referral relationship he had with Sathre, WFPC, and other related entities; and 3) Hosaka concealed material information not known to Davis regarding the risk level associated with the relevant investments she made with Sathre. There was substantial evidence from which the jury could conclude that Davis failed to prove each of these underlying assertions.

First, both Nagel, as the company representative for the firm, and Hosaka testified they only provided tax advice, which sometimes included advice on the tax consequences of certain investments, and that they did not give investment advice. In addition, Nagel testified that the letter concerning the tax consequences of IDCs related to certain oil and gas investments— which Davis offered as the only direct evidence of Hosaka Nagel providing

investment advice—was in fact tax advice and not investment advice.[8]  The testimony of either Nagel or Hosaka, standing alone, is substantial evidence to support the jury's findings that Respondents did not provide Davis with investment advice.  (*Zinn*, *supra*, 148 Cal.App.2d at p. 85.)

Second, there was substantial evidence from which the jury could conclude that Hosaka did not have a referral relationship with Sathre, WFPC, and any of the other related entities.  Sathre denied having any such relationship with Hosaka and testified, to the contrary, that he had only referred a handful of clients to Hosaka and that Hosaka had never referred any clients to him.  In addition, Sathre indicated he only referred Davis to Hosaka because *she* asked who did his personal taxes, and both Davis and Phalen testified they made significant investments with Sathre before they ever even met Hosaka.  Thus, Sathre's testimony, standing alone, constitutes substantial evidence to support the jury's implied finding that there was no referral relationship.  (*Zinn*, *supra*, 148 Cal.App.2d at p. 85.)

Third, there was substantial evidence from which the jury could conclude Hosaka did not conceal any material fact not known to Davis regarding any investment she purchased with Sathre.  Sathre described Davis as "a very sophisticated investor" who had no appetite for traditional stock market investments and specifically requested non-traditional "alternative investments."  Sathre testified he spent a great deal of time explaining the risk factors of each proposed investment to Davis and that he never told her the investments were safe or without risk.  Again, the testimony of Sathre, standing alone, is substantial evidence for the jury to

---

[8]    Davis also asserts the alpaca brochure Hosaka gave her constituted investment advice, but Davis admitted she never invested in alpacas and, thus, any such advice was irrelevant.

28

conclude Respondents did not "intentionally fail to disclose a[ny] fact that Jaimie Davis did not know and could not reasonably have discovered."

However, Davis's own testimony corroborated Sathre. She acknowledged that Sathre provided her with written disclosures of all material information regarding the risks associated with each investment, including the following explicit warnings: " 'You could risk losing all your money and this is highly risky.' " " 'Investment in the partnership is speculative due to the nature of the partnerships proposed drilling activities and involves a high degree of risk of loss.' " Although Davis claimed that Sathre "explained away" those warnings, the jury was entitled to believe Sathre's testimony over hers.

In sum, there was substantial evidence for the jury to conclude Respondents did not provide Davis with any investment advice; Respondents did not have a referral relationship with Sathre, WFPC and other related entities; and Sathre provided Davis with full disclosure of the risks inherent in her investments. Because Davis's two causes of action rise or fall on proof of these three factual assertions, the jury properly found in favor of Respondents.

Davis argues there was evidence to support each of these underlying factual assertions but, as noted, in doing so, Davis fails to understand the relevant standard of review, relies primarily on her own evidence, and improperly asks this court to reweigh the evidence and reassess the credibility of witnesses. (See *Babick, supra,* 229 Cal.App.4th at p. 1246; *Johnson, supra,* 28 Cal.App.4th at p. 622.) We decline to do so and, instead, conclude substantial evidence supports the verdict *actually* rendered by the jury.

IV.

*The Trial Court Did Not Err in Denying Davis's Motion for a New Trial*

As a final matter, Davis contends the trial court erred in denying her motion for a new trial. We review a trial court's ruling on a motion for a new trial for abuse of discretion and we make all presumptions in favor of the order.[9] (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 (*Jiminez*); *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 159 (*Whitlock*).) "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Jiminez, supra*, 4 Cal.3d at p. 387.)

Davis argues the trial court erred by denying the motion on procedural grounds without hearing or determining the motion on the merits. It appears Davis misunderstands the court's ruling. Code of Civil Procedure section 657 sets forth the specific grounds upon which the court may grant a new trial. The court denied Davis's request because it concluded she had not established any of the statutory grounds for granting a new trial. Since it was *denying* the motion, the court was not required to set forth its reasoning in any detail. (See Code Civ. Proc., § 657 [court must specify its reasons for

---

9       Davis asserts where the trial court denies a new trial motion, as it did here, the appellate court must review the entire record to make an independent determination as to whether any error was prejudicial. Davis relies on *City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 872 (*Decker*). As with the standard of review for the motions in limine, Davis confuses the standard for error with the standard for prejudice. The court in *Decker* acknowledged the trial court's discretion in ruling on a motion for a new trial and, only after finding the trial court abused its discretion, did it conclude it was appropriate to consider the entire record in determining whether that error was prejudicial. (*Id*. at pp. 870-872.)

*granting* a new trial]; *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1272, fn. 17 (*Laabs)* ["Although a trial court is statutorily required to state its reasons for *granting* a motion for new trial, it is not required to specify any reasons for *denying* the same motion. (Citation.)"].) We are required to infer from the court's denial of Davis's motion that it made the determinations necessary to support its order. (*Laabs*, *supra*, 163 Cal.App.4th at p. 1272; Evid. Code, § 666 ["Any court of this state . . . is presumed to have acted in the lawful exercise of its jurisdiction."].) Thus, we presume the court considered the merits of Davis's motion, and Respondents' opposition, before reaching its conclusion.

To the extent Davis asserts the trial court abused its discretion in reaching its conclusion, Davis does not develop the argument. Specifically, Davis does not assert the court should have granted the motion based on any of the individual bases set forth in her motion for a new trial, nor does she provide any legal authority to support such a claim. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["An appellant must provide an argument and legal authority to support his contentions."]; *Nelson, supra,* 125 Cal.App.3d at p. 638.) Regardless, we have reviewed Davis's motion for a new trial—which raises many of the same issues we have already addressed with respect to the motions in limine concerning the SEC action and the sufficiency of the evidence—and conclude the trial court did not abuse its discretion in denying the motion.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                                                    DO, J.

WE CONCUR:



HUFFMAN, Acting P. J.



GUERRERO, J.